THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
LOREN HOLM, Defendant-Appellant.

Fourth District No. 4—89—0028

Opinion filed September 28, 1989.

John H. Long and Duane D. Young, both of Long, Rabin & Young, Ltd., of Springfield, and F. Donald Heck, of Quincy, for appellant.

Scott H. Walden, State's Attorney, of Quincy (Kenneth R. Boyle, Robert J. Biderman, and Monroe D. McWard, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LUND delivered the opinion of the court:

On November 11, 1988, following a jury trial in the circuit court of Adams County, defendant Loren Holm was found guilty of committing the offense of aggravated criminal sexual abuse, in violation of section 12—16 of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, par. 12—16). He was subsequently sentenced to five years' imprisonment. Defendant now appeals. We reverse and remand.

Defendant was charged on February 19, 1988, with one count of committing aggravated criminal sexual abuse. The information alleged that defendant, being the father of. L.H., fondled the breasts and vagina of L.H. By a bill of particulars, it was alleged this offense occurred on February 2, 1988, at the Quincy Hobby Center, a family-owned business. The trial commenced on November 9, 1988.

The first witness was the victim, L.H. She was born March 10, 1971, and has been residing in a foster home since February 19, 1988. She lived with her mother, Joann, and defendant until they were separated. A divorce is currently pending, and Joann now lives in Columbia, Missouri. In that family, L.H. has an older sister Michelle, a twin sister Laurie, and a younger brother Michael. She also has two half-sisters. One is Miranda, age 17, and the other is Kirsten, age 11. Their mother is Linda Davis-Holm, who is not married to defendant. At the time of the incident, all the girls lived with Linda and defendant. Defendant owns and has worked at the Quincy Hobby Center for 15 to 16 years. The hobby center sells crafts, ceramics, and remote-control items. Defendant also has a computer business. L.H. began working there when she was 11 years old.

Defendant would frequently go out of town to help score at remote-control model airplane conventions, or go to trade shows. When he went out of town, he usually took a daughter with him. At first, he took Michelle and Miranda, and then he started taking Laurie and L.H. Sometimes he took them individually, and sometimes he took two or three at a time. These weekends were a combination vacation and business.

During the year of 1988, defendant started making sexual advances towards her. This built up gradually over the years. She never saw him make any type of advances towards her sisters. In August 1987, she went on a trip with him to Higginsville, Missouri, to help score a contest. They stayed overnight in a motel room with one double bed. At first, it was not common to share a bed but, as time went on, they did because defendant felt it was necessary to save money. She woke up in the middle of the night, and defendant had his hand between her legs playing with her vagina. She woke him up, and he

told her he was asleep and did it by accident.

The next trip she took with him was February 12 to February 14, 1988, in Belleville, Illinois. This was to attend a meeting of the Society for Creative Anachronism, a medieval reenactment group to which he belonged. At this time, she was having problems at home. She had spoken in front of Miranda about her problems with defendant, and Miranda told Linda. Linda was upset and wanted her out of the house. This was the reason she went with defendant. She did not feel she could go to her mother's house at this time.

When they got to Belleville, they stayed at the Sleepy Hollow Motel. Again, they stayed in one room and shared a double bed. Defendant told her that after they got there, she would learn to be an adult. She found out that night that by this statement, he meant that he should masturbate her, and she should masturbate him. She did not wish to, and they argued. However, she eventually gave in. At this point, she was dressed, and he was not. He undressed her, and the acts were completed. Accordingly, when they got home, she was in a depressed mood.

In Quincy, there were sexual contacts where defendant would commit "feelies" by putting his hand down her shirt or in her pants and feeling around her chest or vagina. Things started building up and led to the Belleville incident. These feelies usually occurred at the hobby center. February 2, 1988, was the last time he touched her sexually, other than on the subsequent Belleville trip.

On that day, she came to work at the center around 3 p.m. after school. At the time, no one else was present. He put his hand down her shirt and played with her breasts. He also put his hand down her pants, between her blue jeans and underwear, and touched her vagina. Michelle and Linda Davis were also working that day. Michelle was out running errands at the time, and Linda was not in.

She acknowledged that she first lived with her mother after the separation and, when she moved in with her father, she made allegations that her mother abused her. She also admitted that in late 1987, defendant and Linda were on her quite a bit about her low grades and not helping around the house and hobby center. She denied this had any involvement with her desire to get out of the house. When she spoke with defendant on February 18, she told him she needed to get out of the house and wanted to go to a foster home. At this point, the State rested.

Miranda Holm, half-sister of L.H., testifying for defendant, stated that in December 1987, both L.H. and Laurie had book reports due. L.H. did not want to do hers and waited until the last possible minute.

L.H. also does not like doing her chores around the house. Defendant and Linda were continually after L.H. to do better in her school work and to do her chores at home. In January 1988, L.H. told her that "I am going to lie. I am going to blackmail my dad so I can get out of the house, so, I am going to go to DCFS and the police and tell them that he raped me." She told Linda about this conversation the next day, which was a Thursday. On that Friday, L.H. went with defendant to Belleville.

She explained that the event on February 12 which L.H. went to was called the Crystal Ball. L.H. asked to go with defendant. Upon their return, L.H. was in a marvelous mood because she had had a wonderful time.

Michelle Holm was 19 years old at the time she testified. She stated that in mid-January 1988, L.H. started talking about moving into a foster home. Also, at this time, everybody was upset with L.H. about her school work and the fact that she was not helping at home as she should. On February 2, 1988, she was working at the hobby center. She started work at 11 a.m. and did not leave the building until 6 p.m. At no time during this period was L.H. alone in the building. Neither was there any time when she was alone with defendant. She specifically remembers that day because a UPS order was delivered and they had a problem with their computer, which defendant had to work on. Linda was also there the whole time except for between 4:15 and 5 p.m. She remembered that when L.H. came home from the Crystal Ball, she was very excited and happy.

On cross-examination, she admitted telling an investigating officer that she did not feel sex between a father and daughter was wrong as long as they were both adult and consenting. She personally does not believe in it. She then admitted that she allowed her father to take a series of pictures of her while she was in a negligee. These pictures were taken after December 1987 at the Sleepy Hollow Motel.

These pictures show Michelle originally dressed in a black night-gown with black panties, bra, and nylons attached to a garter belt. The pictures then show a sequence of her taking these articles off while smiling coquettishly. The final picture shows her lying on the bed on her stomach with everything but her panties off. At no time were her breasts exposed.

She explained these photographs were taken in January 1988. These were taken during a weekend business trip on which she accompanied defendant. Also, on that trip, they were able to get only one double bed and had to share. This had happened other times. However, nothing sexual ever occurred. These photographs were taken to give to

her boyfriend in the Navy. She intended to send them to him one at a time as a joke. After they were processed, she kept them in a drawer in her dresser. She never showed these pictures to defendant.

Linda Davis is employed as the director of education for radiology at Blessing Hospital. She testified L.H. came to live with them in November 1985. In December 1987, they had problems with L.H. doing her book report. They also had problems with L.H. doing her chores. Her responsibilities were no more than those of the other girls. She never saw defendant do anything improper towards L.H. She has seen L.H. attempt to manipulate her father by rubbing her breasts against him.

On February 2, she arrived at the hobby center at 1:30 p.m. She works there as a bookkeeper and office manager. She was in the building the entire afternoon except from 4 to 5 p.m. During that afternoon, she observed, when she went in and out of her office, that L.H. was working with Michelle.

She stated the reason L.H. went to the Crystal Ball was because she and defendant felt L.H. and defendant needed to talk about all the problems going on. When they came back, L.H. was happy and bubbly.

She maintained on cross-examination that a person could not be alone with another at the hobby center without letting others know they wished privacy. She admitted the first time she saw the photographs of Michelle was on February 23, 1988, when the police showed them to her. She also admitted telling the police she did not think it was appropriate for a father to take these types of pictures of his daughter. She also did not know defendant and L.H. would share a bed when they went to Belleville.

Defendant testified that in 1985, L.H. came to live with him, alleging that her mother hit her. He acknowledged having the two families, and stated the children have known each other since they were three to four years of age. In the 1980's when he and Joann were still married, Linda worked for them as a bookkeeper.

The first time he became aware of any allegations of sexual activity was when he was charged with this offense. He denied any sexual contact with L.H. in Higginsville in 1987. Concerning the Belleville trip, he maintained he requested two double beds when he made the reservation. However, when they arrived, all those rooms were being used, so they were stuck with only one bed. He denied any sexual activity occurred there. Upon their arrival home, L.H. was in a very good mood.

He also related the difficulties they had with L.H. concerning her school work and home responsibilities. In January 1988, she expressed

a desire to move out on her own. After he and she discussed the finances necessary, she realized she could not. He also remembers February 2 because of the computer problems. At no time was he alone on that day with L.H.

He admitted taking the pictures of Michelle while they were on a trip, but maintained that they were for her boyfriend. He never had anything else to do with those pictures.

On cross-examination, he denied talking with his wife Joann about a sexual incident between himself and Michelle at a trade fair in April 1986. He also admitted that L.H.'s grade point average has increased since she went into foster placement.

On rebuttal, Officer Kelvin Roberts stated that during an interview, Michelle stated that sex between a father and daughter was acceptable if they both consented. When asked if this applied to a juvenile daughter, she became upset and said she could not answer that question.

Joann Holm, L.H.'s mother, testified she is currently involved in a divorce proceeding with defendant, which is being considered under advisement. In April 1986, defendant went to a trade convention with Michelle in Ohio. Michelle was 16 years old at the time. He told Joann that Michelle came to his bed, snuggled with him, placed his hand down to her genital area, and he proceeded to stimulate her to climax. She went to sleep at that point. Joann characterized defendant as telling this in a bragging manner. Defendant told her no harm was done because he did not penetrate her.

George Harris was L.H.'s guidance counselor at Quincy High School. He saw L.H. on Monday, February 15, in his office. She had been crying and was very agitated and shook up. He saw her every day that week. She was upset and did not want to be alone with defendant.

Gale Sheehan is one of L.H.'s foster parents. He described L.H.'s demeanor at home as being good and that she was also very helpful. She performs her school work and chores.

Finally, Laurie Holm testified she, and not Michelle, went to the trade fair in Ohio in April 1986. Michelle testified she did not go.

The jury found defendant guilty as charged. On January 6, 1989, the court sentenced defendant to five years' imprisonment. Defendant now appeals.

Defendant initially maintains his case should have been dismissed for the State's failure to comply with the speedy trial provisions of section 103—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 103—5). He observes he requested a jury trial on

June 1, 1988, and was not brought to trial until November 9, which is a period of 161 days. Section 103—5 provides that a defendant out on bond, which defendant was, must be tried within 160 days of the jury demand. However, we find no violation occurred because defendant's request for a jury trial was not sufficient to invoke this section's provisions.

Under section 103—5, when a defendant is released on bond, a trial demand must be made in order to trigger the running of the speedy trial term. (*People v. Monaco* (1986), 150 Ill. App. 3d 278, 282, 501 N.E.2d 852, 855.) Where a defendant is at liberty on bond at all times subsequent to the filing of a complaint, the original request for a jury trial cannot be considered a demand for an immediate trial, but only a demand that when the trial is held, it would be before a jury. (*People v. Baskin* (1967), 38 Ill. 2d 141, 145, 230 N.E.2d 208, 210; *Monaco*, 150 Ill. App. 3d at 282, 501 N.E.2d at 855.) The trial demand must be clear, unequivocal, and apparent from the record. *People v. Althide* (1979), 71 Ill. App. 3d 963, 966, 389 N.E.2d 240, 242.

In the present case, a review of the arraignment hearing establishes that no demand for a speedy trial was made, but, rather, defendant indicated he would like a jury trial. The docket entry for that day reads: "Def. pleads not guilty and cause placed on Sept. 1988 jury docket." A preprinted order form was also filed that day. This form reads: "Defendant pleads not guilty & demands jury trial."

It is apparent, then, that defendant has not made a clear, unequivocal demand for an immediate or speedy trial. Rather, pursuant to *Baskin*, he has simply indicated a desire to be tried by a jury. If defendant wished to invoke the provisions of section 103—5, it would have been a simple matter to demand an immediate or speedy trial pursuant to this section. Short of such a demand, a defendant's desires are ambiguous, and it will be concluded no speedy trial demand has been made.

Defendant next complains of several evidentiary rulings. He initially argues the State's cross-examination of Michelle, involving her statement to the police concerning the propriety of father-daughter sexual relations, is improper. We disagree. If, in fact, Michelle does hold this opinion, this evidence would be proper impeachment since it would go to any possible bias she might have for testifying for defendant.

Defendant next contends the court erred by allowing, on rebuttal, the testimony of Joann Holm that defendant told her he masturbated Michelle on a trip in 1986. He argues this is impeachment on the collateral matter, and is offered solely to inflame the jury. The State re-

sponds that it is proper impeachment, and is also admissible under the *modus operandi* theory.

■■ It is well established that evidence of a defendant's other crimes or wrongful conduct is inadmissible to show his propensity to commit a crime because it is too prejudicial. (*People v. Romero* (1977), 66 Ill. 2d 325, 329-30, 362 N.E.2d 288, 290; *People v. Bayer* (1987), 160 Ill. App. 3d 218, 220-21, 513 N.E.2d 457, 459.) One exception to the rule is *modus operandi* evidence. (*People v. McDonald* (1975), 62 Ill. 2d 448, 455, 343 N.E.2d 489, 492-93; *People v. Maness* (1989), 184 Ill. App. 3d 149, 152-53, 539 N.E.2d 1368, 1370-71.) *Modus operandi* means, literally, "method of working." This exception refers to a pattern of criminal behavior which is so distinct that separate crimes or wrongful conduct are recognized as being the work of the same person. (*Maness*, 184 Ill. App. 3d at 153, 539 N.E.2d at 1371; *People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 486, 485 N.E.2d 1292, 1297.) It is relevant to prove the identity of the perpetrator and his commission of the charged crime. *Maness*, 184 Ill. App. 3d at 153, 539 N.E.2d at 1371.

To be admissible, there must be some distinctive features between the offenses that are not common to that type of offense. (*People v. Tate* (1981), 87 Ill. 2d 134, 142-43, 429 N.E.2d 470, 475.) While there must be a strong and persuasive showing of this similarity, it is not necessary that the crimes be identical for the other crime to be admitted into evidence to prove *modus operandi*. *Kimbrough*, 138 Ill. App. 3d at 487, 485 N.E.2d at 1297.

Here, the evidence at trial shows L.H. was 16 years of age at the time of the Belleville incident. She was alone with defendant on a weekend trip, with the result that he masturbated her. The incident with Michelle occurred when she was also 16 years old. She was away with defendant on a trip with a similar result. These are sufficiently similar factual settings to normally allow admission of the evidence under this exception. Admittedly, there are also some differences, but these go to the weight to be given the evidence and not its admissibility.

■■■ However, *modus operandi* evidence is generally offered in a State's case in chief. Its purpose is to help prove the identity of the perpetrator, or that he committed the charged offense, by allowing the jury to reasonably infer he committed one offense from the evidence of the other, showing the "method of work" of the perpetrator. (See *Maness*, 184 Ill. App. 3d at 153, 539 N.E.2d at 1371.) In fact, research has been unable to uncover any case where this exception is asserted to justify cross-examination or impeachment. Thus, the State's argument ·

that the evidence is admissible under this exception seems misplaced.
■■ ■ We do find though the evidence is properly admissible for impeachment purposes. Generally, evidence of other crimes may be admitted if it is relevant to establish any material question other than the propensity of the defendant to commit a crime. (*People v. Stewart* (1984), 105 Ill. 2d 22, 62, 473 N.E.2d 840, 860.) Here, the questioned evidence goes toward establishing a possible sexual liaison between Michelle and defendant. This could have a direct bearing on the determination of Michelle's credibility since it reveals a possible bias or interest on her part. We are aware evidence of this type in this case could be very prejudicial to defendant. However, when such evidence is offered, it is necessary for the trial judge to weigh the relevancy of the evidence to establish the purpose for which it is offered against the prejudicial effect the introduction of such evidence may have on the defendant. (*Stewart*, 105 Ill. 2d at 62, 473 N.E.2d at 860.) In this case, the court did, and we find no error in its determination.

Defendant next argues the court erred by allowing admission of the photographs he took of Michelle. Prior to trial, the court ruled the pictures were inadmissible in the State's case in chief, but reserved ruling on any other use. When defendant objected to their introduction in cross-examination, the court ruled they were proper for impeachment. On appeal, the State insists they were proper for impeachment and for *modus operandi* purposes. We disagree.

Initially, the State argues the pictures were proper impeachment. Since Michelle was not asked on direct examination about the pictures, it appears the purpose of the pictures was to show any bias, interest, or motive for Michelle to testify falsely, by establishing that Michelle and defendant were actively involved in a sexual relationship. While that theory may be valid, this evidence does not support it.

As explained, these pictures are a sequence of 18 pictures in which Michelle is slowly undressing. They culminate in a picture where she is lying on her stomach on a bed with only her panties on. At no time were her breasts exposed.

■■ ■ We acknowledge that it is unusual that a father would take a sequence of pictures such as this of his daughter. It is also unusual that this would occur on a weekend trip where only the two are present, rather than at home. However, it should be remembered that this is a series of pictures of his adult daughter. This does not establish that there is a ongoing sexual relationship, such as would affect Michelle's testimony. When impeaching by showing bias, interest, or motive, the evidence must not be remote or uncertain. (*People v. Triplett* (1985), 108 Ill. 2d 463, 475-76, 485 N.E.2d 9, 15.) Here, it is too uncertain.

The State further contends that, even if they are not proper for impeachment, they are properly admitted under a *modus operandi* theory. We observe that, even if they are distasteful and inappropriate, it is not a crime to take these types of pictures of one's adult daughter, and, thus, we question the applicability of the *modus operandi* analysis. Further, as pointed out earlier, the *modus operandi* exception does not appear applicable to cross-examination and impeachment. However, even if we apply the analysis, it is clear the pictures are not admissible.

■■ As discussed earlier, the *modus operandi* exception refers to a pattern of criminal behavior so distinct that separate crimes or wrongful conduct are recognized as the work of the same person. (*Maness*, 184 Ill. App. 3d at 153, 539 N.E.2d at 1371.) To admit this evidence, there must be some distinctive features between the charged crime and the other crime that are not common to that type of offense. *Maness*, 184 Ill. App. 3d at 153, 539 N.E.2d at 1371.

■■ Here, the only similarity between the incident with Michelle and the incidents with L.H. are that they occurred at the same motel on a weekend trip, and they involved a natural daughter. However, one incident involved a mutual masturbation with a minor daughter against her wishes, while the other involved the taking of photographs of an adult daughter at her request. The requisite distinctive features in common are missing.

■■ The real difficulty with the pictures is that their prejudicial impact outweighs any probative value. There may be some limited probative value concerning defendant's relationship with his daughters.. However, this is far outweighed by their prejudicial effect since, even in these "anything goes" days, it is still viewed improper for a father to take such pictures of his daughter. Even Linda Davis admitted this. In a closely balanced case such as this, involving this type of charge, such inflammatory pictures could result in defendant being convicted due to his bad moral character, rather than on the merits of the charged offense. Accordingly, it is necessary that we reverse defendant's conviction and remand the case for further proceedings.

To assist the trial court in the event of a retrial, we will address defendant's final asserted error. Defendant argues the court erred by refusing to allow him to introduce into evidence the printout of a computer disk he discovered. The evidence at the motion *in limine* hearing established that everyone in the household, including L.H., used the family computer. Apparently, some time after L.H. was removed from the house due to the current complaint, a computer disk was found with her name on it. A printout of that disk showed that in the middle

of some school material was language which showed the writer was fed up with her parents pushing her too hard in school, and that she intended to make a false rape report on defendant to get out of the house. L.H. denied putting that language in.

Defendant wished to use this to cross-examine and impeach L.H. The court, noting there was no security procedure to keep any person in the house, including defendant, from placing that language on the disk, refused defendant's request. We find no error with this determination.

Defendant maintains the court erred by being concerned with questions of reliability and security. He argues he does not wish to introduce the document as substantive evidence, but simply wishes to use it to cross-examine L.H. He believes that once she is cross-examined about the printout, it is up to the jury to determine whether she made the document, and what impact this has on her testimony.

 █ The purpose for cross-examination is to assist in the truth finding process by impeaching a witness' testimony. Here, the evidence established the proffered evidence was uncovered some time after L.H. moved out. It had been generated on a disk labeled with her name. There is no evidence this disk was kept in a secured place or that access to it was limited in any fashion. The evidence also established that any family member, including defendant, had the ability to place the language on the disk since there was no security code to prohibit it. If some person decided to manufacture the evidence to discredit L.H., it would have been an easy matter to find the disk with her name on it, and to place the language there. In fact, there was no explanation given concerning the reason for defendant printing out the disk which lead to the discovery of the questioned language. The possibility of the evidence being manufactured by someone else is too great to allow its use.

We are not saying that a foundational requirement for computer evidence is that no other party could have had access to it. We can envision other circumstances where such evidence may be admissible and helpful. However, to hold as defendant desires in this case, would open the door to all sorts of manufactured evidence being used to impeach witnesses. This would hinder, and not enhance, the truth-seeking process.

Reversed and remanded.

KNECHT and GREEN, JJ., concur.