THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DARNELL TIPTON, Defendant-Appellant.

First District (3rd Division)   No. 1—87—2629

Opinion filed December 19, 1990.—Rehearing denied January 25, 1991.

Michael J. Pelletier and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb, Joseph Brent, and David Stabrawa, Assistant State's Attorneys, of counsel), for the People.

JUSTICE FREEMAN* delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant, Darnell Tipton, was convicted of aggravated criminal sexual assault and armed robbery. (Ill. Rev. Stat. 1987, ch. 38, pars. 12—14(a)(1), 18—2(a).) Defendant was sentenced to an extended term of 60 years for aggravated criminal sexual assault and 30 years for armed robbery, the sentences to run consecutively. Defendant appeals, contending that: (1) the admission of past crimes evidence denied him

---

*Justice Freeman authored this opinion prior to his election to the Illinois Supreme Court.

a fair trial; (2) the prosecution distorted the burden of proof; (3) the trial court erred in imposing an extended term sentence; and (4) the trial court incorrectly considered evidence in determining an appropriate sentence. We affirm.

Prior to trial, the State motioned the court to permit the admission of other crimes evidence. At the hearing on the motion the State argued that "based on the similarity of the cases involving the offender with the [complainant] and [another woman], *** that these cases [went] to show motive, intent, [and] particularly identification." After hearing argument, the court found that there were "an enormous amount of similarities." The court stated that it could see where both of the instances were so close in proximity in time and place, and in method of operation, as to show *modus operandi* and to prove identification. Accordingly, over defendant's objection, the court granted the State's motion to allow the evidence.

At trial complainant testified that, on September 27, 1986, at about 11 p.m., she was walking westbound on Cornelia toward the Ravenswood "el." A man, whom complainant later identified as defendant, ran up behind her, and with a meat cleaver raised in his hand, said, "Don't say anything or I'll cut your head off." Complainant first saw defendant when he was about three feet away. In response to complainant's inquiry as to what he wanted, defendant grabbed her arm and said that she was going to help him get away from the police. Defendant stated that he had just killed a man and that if the man had cooperated he would not have killed him.

Holding the meat cleaver to complainant's neck, defendant walked her southbound, across Cornelia, to an empty lot. Complainant described that defendant was walking behind her and somewhat to the side. She made several attempts to see his face, which was about a foot away from hers.

After the two arrived at the empty lot, defendant had complainant sit on the ground and asked her for her purse. Complainant gave defendant the purse, he looked through it, but was unable to find any money. Defendant told complainant that he did not believe that she did not have any money. Complainant then remembered that she had $5 in her pocket and gave it to him.

Defendant then grabbed complainant by the belt of her pants, put the meat cleaver to her neck, and told her to get up. The two walked southbound, down an alley, where defendant attempted to open a hole in a corrugated metal fence. Defendant and complainant continued to walk until they arrived at another alley. They walked down the alley to an opening between two garages.

Once at the garages, complainant, at defendant's order, removed all of her clothing and performed fellatio on him. After about one minute, defendant told complainant to stand up and to face the garage. Complainant complied, at which time defendant, while standing behind her, had vaginal intercourse with her. The intercourse lasted about one minute. During that time, complainant noticed that defendant had his hands on her midsection, and therefore, she reasoned, he did not have the meat cleaver in his hand. When defendant ordered her to turn around and perform fellatio again, she grabbed his testicles, pulled them, and ran screaming from the alley down Cornelia.

Complainant encountered Ray Mizushima in front of his home at 1214 West Cornelia. After informing Mizushima that she had been raped, Mizushima took complainant into his home and gave her clothing. Complainant then telephoned the Chicago police.

Once the police arrived, complainant described to them her assailant. She stated that defendant wore either a blue jacket and brown pants or a brown jacket and blue pants. She also stated that defendant had a couple of days' growth of beard. She then led them to the scene of the incident, where they discovered her clothes and purse. The police, accompanied by complainant, unsuccessfully toured the vicinity where the incident had occurred. They then returned to the scene of the incident, retrieved complainant's clothing, and transported her to Illinois Masonic Hospital, where she underwent a gynecological examination.

On cross-examination, complainant testified that she glanced at defendant five or six times as he walked her toward the garages. When defendant noticed that she was looking, he told her not to look at him.

On September 29, 1986, complainant identified defendant as her assailant in a police lineup. In addition to the physical identification, complainant, after hearing defendant say "don't say anything or I will cut your throat," made a voice identification.

Anne Penman was permitted to testify concerning another offense involving defendant. According to her, on September 27, 1986, between 11:30 and 11:45 p.m., she was in the vestibule of her apartment at 737 West Cornelia. She went to her door and as she was about to let herself in, she heard a voice from behind say, "[G]ive me your purse or I'll cut your head off." Penman turned and saw a man, whom she later identified as defendant, standing three or four feet away from her. She tossed him her purse. She further testified that defendant was carrying a meat cleaver with a large blade and a wooden handle. Defendant left but immediately returned and asked

her if she had anything in her pockets. Defendant then left and Penman called for assistance.

Penman testified that the vestibule was well lighted. She described her assailant to police as neatly dressed, wearing a light-colored shirt, approximately 5 feet 10 inches tall and weighing approximately 160 pounds. She stated that she could not recall whether defendant was clean shaven. On September 29, 1986, Penman positively identified defendant in a police lineup.

Detective Robert Labbe of the Chicago police department testified that on September 26, 1987, he and his partner responded to a call for help from a woman on Cornelia. When they arrived at the scene, Mizushima told them that he had a rape victim in his home. The officers went inside, spoke to complainant, then broadcasted a flash message over the police radio describing the assailant. The assailant was described as a man wanted for rape; a male black approximately 29 to 31 years old; 5 feet 7 inches in height and slender; short black hair, a dark complexion; and wearing a jacket and dark trousers, armed with a meat cleaver. Labbe testified that he did not write down the description. After giving the flash message, the officers took complainant and went to the scene of the incident.

Detective Edward Roberts of the Chicago police testified that on September 27, 1986, he was working as a beat officer in the area which includes West Cornelia. He heard the flash message. On the following day, Roberts and his partner were investigating a stabbing. They went down an alley at the 600 block of Wellington and discovered defendant hiding under an automobile. Defendant was crouched down in front of the car by the hood. When the officers saw him, he crawled under the car. The officers ordered defendant to stand, performed a pat-down search, and found a meat cleaver in his waistband. Defendant met the physical description of the suspect in the flash message. The officers arrested him and inventoried the meat cleaver.

Defendant's first contention on appeal is that the trial court erred in permitting the evidence of the separate, unrelated armed robbery of Penman. He points out that the jury was instructed that this evidence was received solely on the issue of his identification, presence or design and should be considered by them only for the limited purpose for which it was received. Defendant argues, however, that since the evidence was not probative of these issues a new trial is warranted.

■ Evidence of crimes for which a defendant is not on trial is inadmissible if relevant simply to establish his propensity to commit crime. (*People v. Lindgren* (1980), 79 Ill. 2d 129, 137, 402 N.E.2d 238;

*People v. Holm* (1989), 188 Ill. App. 3d 908, 544 N.E.2d 1237.) It is believed that such evidence overpersuades the jury and creates the risk that the jury might convict the defendant only because it feels he is a bad person deserving punishment. (*Lindgren*, 79 Ill. 2d at 137.) However, this evidence is admissible if relevant for any purpose, such as *modus operandi*, intent, identification, motive, presence, design or absence of mistake. *People v. McKibbins* (1983), 96 Ill. 2d 176, 182, 449 N.E.2d 821, *cert. denied* (1983), 464 U.S. 844, 78 L. Ed. 2d 136, 104 S. Ct. 145; *People v. McDonald* (1975), 62 Ill. 2d 448, 455, 343 N.E.2d 489.

Defendant first argues that the trial court incorrectly believed that the Penman armed robbery was proof of *modus operandi*. Further, he argues that the jury was not instructed to consider the evidence for this purpose, and even had it been so instructed, the evidence did not qualify under that exception.

The State responds that the evidence was properly admitted to show defendant's identity and *modus operandi*. In its brief, the State maintains that the jury was properly instructed that "the evidence of the other offense should be considered only for the limited purpose for which it was admitted; *i.e.*, to show identity and *modus operandi*."

Initially we note that the jury was not specifically instructed on *modus operandi*. The court instructed the jury as follows:

> "Evidence has been received that the defendant has been involved in an offense other than that charged in the Indictment. This evidence has been received solely on the issue of defendant's identification, presence, and design. This evidence may be considered by you for the limited purpose for which it was received." See Illinois Pattern Jury Instructions, Criminal, No. 3.14 (2d ed. 1981).

*Modus operandi* means the method of working; it refers to a pattern of criminal behavior which is so distinct that separate crimes or wrongful conduct is recognized as being the work of the same person. (*People v. Maness* (1989), 184 Ill. App. 3d 149, 153, 539 N.E.2d 1368; *People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 486, 485 N.E.2d 1292.) It is relevant to prove the identity of the perpetrator, or that he committed the charged offense by allowing the jury to reasonably infer that he committed one offense from the evidence of the other, showing the "method of work" of the perpetrator. (*Maness*, 184 Ill. App. 3d at 153; *People v. Houseton* (1986), 141 Ill. App. 3d 987, 490 N.E.2d 1354.) To be admissible, there must be some unique features between the offenses that are not common to that type of of-

fense. (*People v. Tate* (1981), 87 Ill. 2d 134, 142, 429 N.E.2d 470.) While there must be a strong and persuasive showing of this similarity, it is not necessary that the crimes be identical for the other crime to be admitted into evidence. *Kimbrough*, 138 Ill. App. 3d at 487.

Defendant has cited to several cases (*People v. Phillips* (1984), 128 Ill. App. 3d 457, 470 N.E.2d 1137; *People v. Dickerson* (1983), 119 Ill. App. 3d 568, 456 N.E.2d 920; *People v. Alford* (1982), 111 Ill. App. 3d 741, 444 N.E.2d 576; *People v. Connors* (1980), 82 Ill. App. 3d 312, 402 N.E.2d 773; *People v. Cook* (1977), 53 Ill. App. 3d 997, 369 N.E.2d 246), as examples of when the asserted similarities were held to be insignificant to qualify the other crimes evidence for the *modus operandi* exception. He argues that the claimed similarities here are likewise insignificant. We disagree and find that the cases cited by defendant lend no support to his argument.

In *Connors*, for example, the suggested similarity was that two robberies occurred four hours and six blocks apart, at night with a gun near the victim's car, and one victim was warned, "[d]on't make me shoot," while the other victim was warned "[i]f you move I'll shoot you." The court held that this threat, or some form thereof, was common to most robberies.

In *Alford* the claimed similarity was that two shootings occurred within five days of each other, a block apart, in a neighborhood where defendant lived. The court found that the dissimilarity, *viz.*, that one shooting occurred on the street without explanation and the other followed an argument in a tavern, disqualified the crimes for the *modus operandi* exception.

■ Here the evidence at trial showed that complainant and Penman were both approached on the same evening, in the same vicinity, by a black male haling a meat cleaver. The assailant threatened both women, stating that he would cut off their heads. We do not believe it to be common to most rapes and robberies that the perpetrator carries a meat cleaver and threatens decapitation. Admittedly, there are some differences between the two incidents; however, these go to the weight to be given the evidence, not its admissibility. (See *Holm*, 188 Ill. App. 3d 908.) We believe that these facts, while not overwhelming, are sufficiently similar and distinctive to qualify as evidence of *modus operandi*.

■ We also note that *modus operandi* and identity are two distinct exceptions to the exclusionary rule on evidence of other crimes. As we have previously stated, proof of *modus operandi* may be probative on the issue of identity. However, while proof of *modus operandi* requires some showing of distinct similarities, proof of identity may

not. In the present case, the trial court did not instruct the jury on the *modus operandi* exception, but instead instructed on the issue of identity. It is conceivable, in light of the court's stated reasons for permitting the testimony, that the court was using the terms "identity" and *"modus operandi"* interchangeably. Nevertheless, the evidence was properly admissible to show both, and thus we find that this defect in the instruction was not so substantial that it denied defendant a fair trial.

■ Defendant next argues that the other crimes evidence was not relevant on the issue of common design. We agree. The common design exception to the exclusionary rule on evidence of other crimes is, like the other exceptions, a separate legal principle. However, many Illinois courts have tended to use the terms "common design or scheme" interchangeably with *modus operandi*. (See *People v. Fuller* (1983), 117 Ill. App. 3d 1026, 454 N.E.2d 334; *People v. Burgin* (1979), 74 Ill. App. 3d 58, 392 N.E.2d 251; *People v. Therriault* (1976), 42 Ill. App. 3d 876, 356 N.E.2d 999.) In fact, the terms have different meanings. Common design refers to a larger criminal scheme of which the crime charged is only a portion. (*People v. Bryan* (1987), 159 Ill. App. 3d 46, 51, 511 N.E.2d 1289.) However, common design, like *modus operandi*, may also be probative of the identity of the offender. *Bryan*, 159 Ill. App. 3d at 51; *People v. Barbour* (1982), 106 Ill. App. 3d 993, 999, 436 N.E.2d 667.

■ We find that the testimony of Penman was not properly admitted as evidence of a common design or scheme. There is no evidence to suggest that either offense was part of a larger criminal scheme. Thus, the issue becomes whether the court's instruction on this exception unfairly prejudiced defendant. We believe that it did not. While the limiting instruction to the jury included the design exception, there was no likelihood of confusion that would disadvantage defendant. See, *e.g., Maness*, 184 Ill. App. 3d 149.

Defendant concedes, and we are satisfied, that the other crimes evidence was admissible to prove presence since it was closely related to the crime charged in point of time, place and circumstance. (*People v. Sigman* (1976), 42 Ill. App. 3d 624, 633, 356 N.E.2d 400, *cert. denied* (1977), 434 U.S. 839, 54 L. Ed. 2d 102, 98 S. Ct. 133.) He argues, however, that this evidence could have been elicited without revealing to the jury that Penman was also a crime victim. He concludes that testimony which included the details of the Penman robbery served to persuade the jury to disregard any doubts it might have had as to defendant's identity as the offender because he was apparently a dangerous person.

We recognize that the risk of prejudice is inherent any time evidence of other unrelated crimes is admitted. For that reason, only that amount of evidence which is probative of the issue should be admitted. The trial court must be careful to limit evidence of crimes to that relevant on the issue for which it is admitted. (*People v. Bartall* (1983), 98 Ill. 2d 294, 315, 456 N.E.2d 59; *Maness*, 184 Ill. App. 3d 149.) The other crimes testimony should be allowed only to the extent necessary to prove the factual similarity to the charged crime.

However, we do not find the evidence presented on the other crime to have been excessive. The factors which were unique to the two offenses were that defendant carried a meat cleaver and that he threatened the use of the cleaver to induce the victims to cooperate. In order to show these similarities, it was necessary for the State to elicit this testimony. Penman was the only witness to testify concerning that unrelated crime and no greater detail than that necessary to demonstrate the similarities was given. We also note that as a safeguard against any overly prejudicial effect, the jury was given a limiting instruction on the use of the evidence.

Defendant cites this court to *People v. Butler* (1971), 133 Ill. App. 2d 299, 273 N.E.2d 37, as support for his argument that the testimony here should have been limited to Penman's identification of defendant. In *Butler*, a Mustang had been used by the defendant in the charged offense. The defendant denied ever driving a Mustang. The State produced a witness who stated that five days prior to the charged offense she had observed the defendant driving a Mustang. In addition to that testimony, the State elicited testimony that the defendant had robbed the witness while threatening to harm her with an ice pick.

The *Butler* court held that the testimony should have been limited to identifying the defendant as the person driving the type of car in question and to the extent that it mentioned the prior crime it was inadmissible. The court stated that the additional testimony that the witness had been robbed by defendant at the point of an ice pick some five days prior to the crime charged, and in a different part of the city, could have been offered only to inflame the jury against the defendant and that that evidence did not qualify under any of the exceptions to the general rule.

In *Butler*, the evidence was admitted for the sole purpose of proving identity of the defendant. Here, the evidence was probative on both the issue of identity, as well as defendant's presence in the vicinity of the crime. Additionally, there was no effort in *Butler*, as here, to prove identity through *modus operandi*; there was no suggestion

that the crimes there shared unique similarities.

Here, in order to show the similarities in the offenses, and thus prove identity, it was necessary for the State to elicit from Penman the verbal threat. It was the verbal threat, along with the meat cleaver, which served to earmark both incidents as the handiwork of defendant.

Defendant also concedes that identification was at issue in the case. He argues that there were a number of facts which the jury could consider as weighing negatively on the strength of the identification evidence. Absent the other crimes evidence, there is no certainty that the identification issue would have been resolved against defendant. Thus, he asserts, a new trial should be ordered.

Defendant's argument would seem to support, rather than defeat, the State's claimed need for the other crimes evidence. Accepting, *arguendo*, that defendant's identification. was uncertain, the other crimes evidence would serve to bolster other identification evidence presented by the State. However, we believe that the identification would have been resolved against defendant even had the other crimes evidence been excluded.

Complainant's identification of defendant in the lineup was immediate and positive. Her in-court identification was unequivocal. Additionally, there was no testimony to contradict that identification testimony. Further, the weapon described by complainant, retrieved from defendant and inventoried by the police served to bolster that identification. We are not persuaded that the jury would have found otherwise on the issue of defendant's identity; the other crimes evidence properly served to bolster the strength of complainant's identification evidence. See *Houseton*, 141 Ill. App. 3d at 993.

Defendant's second contention is that he was denied a fair trial because of improper remarks made by the State in closing argument. In his rebuttal closing argument, the prosecuting attorney stated the following:

> "Now in order for you to find him not guilty, you really have to believe that this is the world's most unfortunate man. You have to believe in cruel fate, because in order to find him not guilty of any of those charges, you have to believe that this man has an identical twin.
>
> * * *
>
> Someone who has a face just like his, someone who is five foot seven and looks just like him, someone who just happened to be near where his identical twin was raping and sticking up women within twenty-four hours of that, and that he just hap-

pened to have the same weapon on him twenty-four hours later that his identical twin had eight blocks away, which are miles away from where he lives. But that's not what this case shows. It doesn't show him to be the unfortunate m[a]n. The unfortunate people are Anne and [complainant]. He just got caught. That's what's unfortunate for him. If you were to find him not guilty, then you have to say to yourself, 'In order to find him not guilty, I have to do this. I have to in twenty-four hours leave that jury room, and I have to go out, and I have to find someone hiding under a car within eight blocks of where a serious crime has occurred and find this on this person.' If you can leave that jury room and if you can start looking up someone that looks like—just like him—.

* * *

That looks just like him within blocks of a rape with this kind of distinct weapon, then he's not guilty."

The State argues that defendant, by his failure to include this argument in his post-trial motion, has not preserved it for review. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186-87, 522 N.E.2d 1124, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274; *People v. Phillips* (1989), 186 Ill. App. 3d 668, 542 N.E.2d 814.) Defendant admits that he did not include this contention in his post-trial motion; however, he urges that *Enoch* left the plain error doctrine (107 Ill. 2d R. 615(a)) intact, and that any argument which distorts the State's burden of proof rises to that level.

The evidence here was not so closely balanced as to require the invocation of the plain error doctrine. (*People v. Lucas* (1981), 88 Ill. 2d 245, 251, 430 N.E.2d 1091; *People v. Harris* (1989), 187 Ill. App. 3d 832, 543 N.E.2d 859.) However, courts have, on occasion, relaxed the waiver rule on the basis of fundamental fairness. (*People v. Brown* (1972), 52 Ill. 2d 227, 287 N.E.2d 663; *People v. Belvedere* (1979), 72 Ill. App. 3d 998, 390 N.E.2d 1239.) It is on this basis that we consider defendant's argument.

■ Prior to addressing defendant's arguments, we set out the applicable rules. It is settled that a prosecutor is given great latitude in making closing arguments, and the trial court's determination of the propriety of the argument will stand absent a clear abuse of discretion. (*People v. Cisewski* (1987), 118 Ill. 2d 163, 175, 514 N.E.2d 970; *Harris*, 187 Ill. App. 3d at 841-42.) The prosecuting attorney may not make arguments or assumptions which have no basis upon the evidence. (*People v. Heidorn* (1983), 114 Ill. App. 3d 933, 938, 449 N.E.2d 568; *People v. Escobar* (1979), 77 Ill. App. 3d 169, 395 N.E.2d

1028.) This is especially true in rebuttal argument, as then defense counsel is without any opportunity to respond. (*Heidorn*, 114 Ill. App. 3d at 938.) Generally, improper comments or remarks made by a prosecutor do not constitute reversible error unless they are a material factor in the conviction (*People v. Cobb* (1989), 186 Ill. App. 3d 898, 914, 542 N.E.2d 1171), or result in substantial prejudice to the accused (*People v. Morgan* (1986), 112 Ill. 2d 111, 132, 492 N.E.2d 1303, *cert. denied* (1987), 479 U.S. 1101, 94 L. Ed. 2d 180, 107 S. Ct. 1329; *People v. Baptist* (1979), 76 Ill. 2d 19, 29, 389 N.E.2d 1200).

Defendant first argues that the State misstated which facts the jury must find in order to acquit him. He maintains that the closing statement distorted the burden of proof by incorrectly suggesting what the jury must find in order to acquit him.

In *People v. Crossno* (1981), 93 Ill. App. 3d 808, 417 N.E.2d 827, a case upon which defendant relies, the prosecuting attorney, in his rebuttal argument, stated that if the jury believed defendant, it should acquit him of all charges, but if the prosecution witnesses were believed, then the defendant should be convicted of all charges. The reviewing court noted that the correct standard for the jury's consideration had been obscured by the prosecutor's comments. The court stated that " '[t]he test is, of course, not which side is more believable, but whether, taking all of the evidence in the case into consideration, guilt as to every essential element of the charge has been proven beyond a reasonable doubt.' " *Crossno*, 93 Ill. App. 3d at 822, quoting *United States v. Stanfield* (9th Cir. 1975), 521 F.2d 1122, 1125.

Preliminarily, we do not believe that the statements here were comparable to those in *Crossno*. Further, we find that statements such as the ones made in *Crossno* do not necessarily require reversal. For example, in *People v. Alexander* (1984), 127 Ill. App. 3d 1007, 1015, 470 N.E.2d 1071, *cert. denied* (1985), 471 U.S. 1019, 85 L. Ed. 2d 308, 105 S. Ct. 2027, the prosecuting attorney stated, "in order to believe the defendant's testimony it would be necessary to 'disbelieve each of the state's witnesses.' " On review, the court held that while the prosecutor's argument was not wholly accurate, it did not believe that the jury was misled by it. Moreover, the court stated, the defendant's testimony did, in fact, contradict that of the significant State witness.

While our research has revealed no cases which are squarely on point, we find *People v. Holmes* (1976), 41 Ill. App. 3d 956, 965, 354 N.E.2d 611, *rev'd* (1978), 69 Ill. 2d 507, 372 N.E.2d 656, to be most similar. There, the prosecuting attorney, in closing argument, stated

"if he [defendant] didn't do it [commit the offense], who did?" The defendant argued that these remarks destroyed the presumption of innocence and shifted the burden of proof to the defendant.

On review, the court noted that defendant, in making the assertion, had taken the remarks out of context. The court stated that the remarks served the purpose of emphasizing that the identity of the offender had been proved beyond a reasonable doubt. Viewed in the proper context of the prosecutor's argument, such remarks did not transcend the bounds of legitimate comment.

On appeal to the supreme court, the defendant again raised the issue of the propriety of the prosecution's closing comments. The court, noting its disapproval of the claimed prejudicial remarks, declined consideration.

Where there are allegations of prosecutorial misconduct, arguments of both the prosecutor and defense counsel must be reviewed in their entirety, and complained-of comments must be placed in their proper context. (*People v. McBounds* (1989), 182 Ill. App. 3d 1002, 1015, 536 N.E.2d 1225; *People v. Tiller* (1982), 94 Ill. 2d 303, 447 N.E.2d 174, *cert. denied* (1983), 461 U.S. 944, 77 L. Ed. 2d 1302, 103 S. Ct. 2121.) Accordingly, we have examined the arguments of the parties.

■ The prosecutor's comments here did not mislead the jury as to the burden of proof. In so finding, we consider that in the prosecutor's closing argument, she stated to the jury that the judge would instruct them on each of the elements of the charged offenses which the jury would have to find in order to find defendant guilty. Additionally, in defendant's closing argument, counsel argued that it was the State's responsibility to prove defendant's guilt beyond a reasonable doubt. Finally, in its instructions to the jury, the trial judge stated that the burden of proof was on the State. The trial court also instructed on the elements of each charged offense. Moreover, we believe that the State's comments, as in *Holmes*, were no more than persuasive argument that the State had proved defendant's identity beyond a reasonable doubt. We therefore conclude that these comments, when considered in context with the rest of the arguments and the court's instructions to the jury, did not alter the State's burden of proof.

■ Defendant next argues that the jury was misled to believe that the statistical improbability or impossibility of the offender being someone other than defendant translated into elimination of any reasonable doubt of guilt. He cites to *People v. Harbold* (1984), 124 Ill. App. 3d 363, 464 N.E.2d 734, and *People v. Collins* (1968), 68 Cal. 2d

319, 438 P.2d 33, 66 Cal. Rptr. 497, as support. Not only are we unpersuaded by defendant's argument, we find *Harbold* to be distinguishable.

In *Harbold*, the prosecution presented the testimony of an expert who stated that "the chances of selecting any two people at random from the population and having them accidentally have identical blood types in each one of these factors is less than one in 500, that is, what we call the probability of an accidental match is less than one in 500." (*Harbold*, 124 Ill. App. 3d at 381.) The court believed that this testimony to statistical probabilities encouraged the jury to disregard evidential risks traditionally weighed in determining guilt or innocence, and focused unfairly upon a numerical conclusion. The court held that the testimony was irrelevant and beyond the proper scope of expert opinion, and further, in light of the closeness of the circumstantial evidence, it gave a false impression of precision in the measurement of guilt.

First, in *Harbold*, the objectional statements were presented, by an expert, as evidence in the case, not, like here, as persuasive argument by counsel. Second, in *Harbold*, the State's closing argument encouraged the jury to focus unfairly upon a numerical conclusion. (124 Ill. App. 3d at 383.) There was no real reliance on the law of statistical probabilities in this case.

Further, a review of the closing arguments reveals that defense counsel maintained that complainant had identified the wrong person. She argued that the inconsistencies in complainant's and Penman's identifications were proof that it was not the same person who was involved in the two offenses. Additionally, the defense questioned the reliability of complainant's identification, pointing out that at the time of the identification, complainant was very upset, nervous, and that she had not had sufficient opportunity to view her assailant. Defense counsel concluded that defendant did not assault complainant; "a black man did, but it was not defendant."

We believe that the State's closing remarks were invited by defense counsel. Further, since identity was at issue in this case, we find the remarks to have been proper comment on the evidence presented. Moreover, even were we to conclude that the comments were inappropriate, in light of the overwhelming evidence of defendant's guilt, we do not believe that he was substantially prejudiced by them.

■■ Defendant's third contention is that the trial court improperly sentenced him to an extended-term sentence. He first argues that prior to this offense, he had not been convicted of any offense classified as a Class X or greater. Contrarily, the State argues that since

defendant had been previously convicted of an offense, the substantive elements of which constituted a Class X offense, the extended-term sentence was proper.

Defendant correctly argues that he would qualify for an extended-term sentence if he had previously been convicted of a Class X or greater offense. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—5—3.2(b)(1).) Aggravated criminal sexual assault is a Class X offense. (Ill. Rev. Stat. 1987, ch. 38, par. 12—14(c).) In 1973, defendant was convicted of rape, which was then classified as a Class 1 felony. (Ill. Rev. Stat. 1973, ch. 38, par. 11—1(c).) In 1978, rape was reclassified as a Class X offense. (Ill. Rev. Stat. 1979, ch. 38, par. 11—1(c).) Effective July 1, 1984, the rape statute was repealed and the legislature enacted the Criminal Sexual Assault Law of 1984.

Defendant maintains that the elements of rape are the same as those for the offense of criminal sexual assault; therefore, criminal sexual assault was intended to replace the rape statute. He argues, since criminal sexual assault is a Class 1 felony (Ill. Rev. Stat. 1987, ch. 38, par. 12—13(b)), his 1973 rape conviction would have constituted only a Class 1 felony at the time of this conviction for aggravated criminal sexual assault. Thus, he concludes, he has not been convicted of an offense of the same or greater class than the aggravated criminal sexual assault.

*People v. Butler* (1979), 78 Ill. App. 3d 809, 396 N.E.2d 1374, a case upon which defendant relies, seems to us not to support defendant's argument. In *Butler*, the defendant argued that when he had been previously convicted of armed robbery, the offense was a Class 1 felony. Therefore, despite the fact that that offense had been reclassified as a Class X offense, the prior offense could not serve as the predicate offense for purposes of imposing an extended-term sentence. The reviewing court, in rejecting the defendant's argument, stated that even though the offense had been reclassified, the elements which constituted the offense had not changed.

Arguments similar to the one which defendant here advances have been considered and rejected in at least four other Illinois cases. (See *People v. Smith* (1990), 199 Ill. App. 3d 839, 557 N.E.2d 596; *People v. Terry* (1988), 177 Ill. App. 3d 185, 532 N.E.2d 568; *People v. Cannady* (1987), 159 Ill. App. 3d 1086, 513 N.E.2d 118; *People v. Sims* (1987), 166 Ill. App. 3d 289, 519 N.E.2d 921, *cert. denied* (1988), 488 U.S. 844, 102 L. Ed. 2d 92, 109 S. Ct. 118.) In *Sims* the court noted that the amendatory act of 1983, which repealed the offense of rape and created the offenses of criminal sexual assault and aggravated criminal sexual assault (Ill. Rev. Stat. 1987, ch. 38, pars. 12—12

through 12—18), contained a savings clause. The clause provides that the abolition of any offense by this act does not affect any penalty or punishment accrued under any law in effect immediately prior to the effective date of this amendatory act. Further, the clause provides that the amendments shall apply only to those persons who commit offenses prohibited under the act after the amendatory act's effective date. Therefore, the court held, a 1965 rape conviction, which had been subject to the 1978 reclassification, would qualify as one of the predicate Class X felonies required under the habitual criminal statute.

In *Terry* the defendant argued that elements of the offense for his 1971 rape conviction constituted, under the new classification, the elements of criminal sexual assault. Therefore, he argued, his rape conviction should not be considered a Class X felony for purposes of the habitual criminal statute. The *Terry* court, relying on the reasoning in *Sims*, rejected defendant's argument. The court stated that at the time the amendatory act went into effect, rape was a Class X felony. Therefore, the court concluded, the defendant's 1971 conviction was appropriately considered as one of the required Class X felonies.

The *Terry* court further reasoned that it believed this analysis furthered the legislative intent to remove career rapists from society. Finally, the court noted that a review of the defendant's 1971 rape conviction established that he had used a knife while committing the rape. The use or threatened use of a deadly weapon during the commission of a sexual assault constitutes aggravated criminal sexual assault. Therefore, the court concluded, the defendant's conduct in the 1971 rape satisfied the elements of aggravated criminal sexual assault, which is currently a Class X felony. See also *Cannady*, 159 Ill. App. 3d 1086, 513 N.E.2d 118 (1969 rape, enhanced by robbery, constituted an offense equivalent to those felonies presently categorized as Class X felonies).

Defendant argues that proof of aggravated criminal sexual assault requires proof of facts in addition to those which are necessary to convict him of the 1973 rape. We note, as the State pointed out in its brief, that defendant accomplished the 1973 rapes with the threatened used of a knife. We are persuaded by the reasoning in the cases cited above, and we adopt their reasoning as applicable here. Therefore, we hold that the trial court properly considered defendant's 1973 rape conviction as a predicate offense for the imposition of the extended-term sentence.

Defendant next argues that the extended-term sentence was improper because his conduct was not "accompanied by exceptionally

brutal or heinous behavior indicative of wanton cruelty." (Ill. Rev. Stat. 1987, ch. 38, par. 1005—5—3.2(b)(2).) The extended-term statute, which is set forth in the disjunctive, permits the imposition of an extended term if any one of the enumerated factors is present. (*People v. Clay* (1984), 124 Ill. App. 3d 140, 153, 463 N.E.2d 929; *People v. Perez* (1981), 101 Ill. App. 3d 64, 427 N.E.2d 820.) Since we have determined that defendant was properly sentenced to the extended term based on the classification factor, we need not address his argument concerning the brutal nature of the offense.

Defendant's fourth and final contention is that the trial court relied on unreliable information in sentencing him. At the sentencing hearing Wayne Michels, a former sociologist for the Department of Corrections, testified concerning disciplinary reports maintained on defendant during his incarceration for prior offenses. Defendant argues, since the trial court had no basis for finding that the reports constituted reliable evidence that defendant engaged in the activities reported therein, a new sentencing hearing is required. We disagree.

During the sentencing phase of trial, the trial judge is not limited to evidence that would be admissible only during trial. The court may exercise wide discretion in the types of evidence used to determine an appropriate punishment. (*People v. Ruiz* (1982), 94 Ill. 2d 245, 268, 447 N.E.2d 148, *cert. denied* (1983), 462 U.S. 1112, 77 L. Ed. 2d 1341, 103 S. Ct. 2465.) However, the evidence must satisfy standards of relevancy and reliability. (*People v. Morgan* (1986), 112 Ill. 2d 111, 143, 492 N.E.2d 1303, *cert. denied* (1987), 479 U.S. 1101, 94 L. Ed. 2d 180, 107 S. Ct. 1329; *People v. Meeks* (1980), 81 Ill. 2d 524, 411 N.E.2d 9.) While there is no requirement that the trial court restrict its consideration to criminal conduct which resulted in prosecution and conviction, the court must exercise care to ensure that the information it considers is accurate. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 499, 431 N.E.2d 344.) Finally, institutional records which report the defendant's conduct in jail are an appropriate matter for consideration when determining his rehabilitative potential. *People v. Maldonado* (1980), 80 Ill. App. 3d 1046, 1050, 400 N.E.2d 656.

Initially we note that defendant never asserted at the hearing that the institutional records were unreliable, nor did he object to Michels' testimony regarding the same. The only objection raised to Michels' testimony concerned the number of reported sexual assaults by defendant during his incarceration. In fact, defense counsel engaged in cross-examination of Michels concerning facts contained in the records.

That notwithstanding, we believe that the trial court had good

reason to believe that the information was trustworthy and reliable. We note, as did the court in *People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344, that the challenged information here was presented in open court, in the form of sworn testimony and subject to cross-examination. (See also *People v. Goebel* (1987), 161 Ill. App. 3d 113, 514 N.E.2d 60.) Further, the information was relevant to determine an appropriate sentence since it bore directly on the issue of whether or not defendant was likely to commit similar offenses in the future. We find no impropriety.

For the foregoing reasons, we affirm the judgment of the circuit court.

Affirmed.

CERDA, P.J., and WHITE, J., concur.