THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
DARRYL HOUSE, Defendant-Appellant.

First District (2nd Division)   No. 1—88—3506

Opinion filed July 21, 1992.

Rita A. Fry, Public Defender, of Chicago (Timothy J. Leeming, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and David Stabrawa, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:
On November 1, 1986, Richard Sax (Sax) was found dead in the front seat of his car which was parked in an empty parking lot near Halsted and Cherry Streets in Chicago. On December 23, 1986,

defendant, Darryl House, was arrested and charged with the murder and armed robbery of Sax. Following a jury trial, defendant was found guilty of both charges and was sentenced to an extended term of 80 years in the custody of the Illinois Department of Corrections.

According to her testimony at trial, T.B., a minor and an eyewitness to, and participant in, the crime, stated that on October 31, 1986, she, her friend, Erika Simpson,[1] and defendant were "going to go *** flag down a car [and] rob somebody." Armed with a gun, defendant flagged down Sax's car at the intersection of Halsted and Division Streets. After defendant had talked to Sax for a few minutes, defendant signaled to T.B. and Simpson to get into the car. Defendant got into the front passenger's seat and T.B. and Simpson got into the back seat. Sax then drove the car to the Shrimp House Restaurant on Division Street and gave Simpson money to buy some shrimp. According to T.B.'s testimony, Sax agreed to buy marijuana from defendant and paid him the money in advance. After leaving the restaurant, defendant directed Sax to a nearby parking lot, a more secluded location, in order to complete the transaction. When defendant failed to produce the marijuana and refused to return Sax his money, the two began to argue. Defendant, Simpson, and T.B. got out of the car, but then defendant entered the back seat behind Sax and shot him in the head. T.B. further testified that she and Simpson ran once they heard the gunshots. The next day she saw defendant, who told her "if I tell anybody, he was going to kill me."

During cross-examination T.B. admitted that when she was originally questioned by the police on the evening of December 22, and the early morning hours of December 23, 1986, she had given them a different version of the incident: that she did not know defendant was going to rob Sax and that she did not know defendant had a gun until the shooting occurred. It was also developed at trial that the statement which T.B. had originally given to the police regarding Sax's location when he was shot was inconsistent with the findings of the police investigation, in that T.B. initially had stated that Sax was shot while standing outside of the car and was then placed in the driver's seat; but the police investigation indicated that it was more likely that Sax was shot while sitting in the driver's seat.

Based on T.B.'s December 22-23, 1986, statement, as well as a statement given by Simpson, the police drove to defendant's home on

---

[1]Simpson and defendant were tried together, but Simpson waived her right to a jury trial.

December 23, 1986, at approximately 5:15 p.m. Officers Villardita and Kaminski approached the front door, while Officers Richter and Sobolweski were positioned in the back of the house. Villardita knocked on the door and defendant's 13-year-old brother answered. Villardita testified at trial that when defendant came to the door he and his partner identified themselves as police officers and "told [defendant] we wanted him to come to Area 6 Violent Crimes with us, we were investigating a crime." Kaminski, Villardita's partner, testified that when defendant came to the door "[Villardita] stated that we wanted to talk to him." Once at the station, defendant was placed in an interview room, handcuffed to the wall and left unattended for approximately 15 minutes. In that room there were plastic chairs with metal legs. When Villardita came into the room to speak with him, he told defendant "we were investigating a murder that had happened Halloween night, where it happened, on Goose Island, and *** I advised him of his rights." Defendant acknowledged that he understood those rights. Thereafter, defendant had several conversations with the police in which he made several incriminating statements. At approximately 7 p.m. Assistant State's Attorney Timothy Joyce arrived and spoke with defendant for approximately 15 minutes. During this conversation defendant agreed to make a statement but declined to make it in the presence of a court reporter, preferring instead that Joyce write it out for him. Joyce accordingly drafted a statement which defendant read aloud and signed; the statement was witnessed by Joyce, Villardita and Detective Johnson.

In the statement, defendant acknowledged that he had been read and understood his *Miranda* rights. He also admitted that he and Erica Simpson and T.B. had decided to "rip someone off" and that he had flagged down the car driven by Sax. All three of them got into the car, and when Sax learned that defendant did not have any marijuana at the time he had offered to sell him some, he gave defendant money to buy it for him. After they left the Shrimp House Restaurant on Division Street, defendant directed Sax to an empty parking lot near the corner of Halsted and Cherry Streets, in order to complete the transaction. When Sax said that he did not want to buy the marijuana but wanted his money back, defendant became angry and shot him with a .38 caliber revolver. After defendant shot Sax, he took from him his silver money clip, which contained approximately $30.

In his interview with Joyce, defendant did not mention to him that he had been physically abused or coerced into making his statement and Joyce did not notice any marks or bruises on any part of defendant's body or tears in his clothing. Villardita testified that he

neither used force against nor coerced defendant into making his statement and that he did not witness any other officers committing these acts. Officer Kaminski testified that he never struck, punched, stomped, kicked or threw a chair on defendant, and that in his presence he never saw anyone threaten or strike defendant.

On December 24, 1986, after defendant had been placed in the lock-up area of Branch 66, he met with James Mullinex of the Cook County public defender's office. Mullinex testified that an investigator from that office took photographs of defendant. Mullinex recalled that defendant had "some markings on his wrists *** [and] on his back as well [, although the mark on the back] appears to be scabbed over. *** [He was also wearing] a black shirt and there was a hole in the black shirt, a round hole maybe about an inch in diameter."

Also at trial Ronald Rose, an emergency medical technician employed at the Cermak Health Center, a part of the Cook County jail, testified on behalf of the State. Rose stated that as part of his job he screens inmates who are brought into the jail for medical problems, and on December 24, 1986, he examined defendant. At that time defendant did not complain of any injuries, and when asked about his health, defendant stated that it was good. Rose noted no bruises or other signs of trauma on defendant.

At trial defendant testified on his own behalf and stated that, when the police appeared at his door, "they said they caught the person who stabbed [me a few months earlier]. Would I come down and identify him in the line-up." When they arrived at the police station, defendant was placed in a small room for approximately 30 minutes. Later four police officers entered the room and began asking him questions regarding a murder in which [T.B.] had implicated him. In support of his claim that his confession was coerced, defendant testified that when he denied knowing anything about the murder, the police began to slap, kick, stomp and hit him with their hands and a plastic chair with metal legs. Defendant also stated that he was denied an opportunity to make a phone call, and that he told Assistant State's Attorney Joyce that he had been beaten. When presented with the photographs taken by the public defender's office, defendant stated that they accurately depicted his physical status on December 24, 1986. Defendant circled the locations on the pictures which, he alleged, illustrated his swollen face, swollen lip, and scarred wrist. The photographs were introduced into evidence and were before the jury during their deliberations.

The jury convicted defendant of both murder and armed robbery, and on November 30, 1988, after a hearing in aggravation and mitiga-

tion, the court sentenced him to 80 years in the custody of the Illinois Department of Corrections. That same day, defendant filed a motion for a new trial which was denied, and he later filed a timely notice of appeal.

## I

Prior to trial defendant filed a motion to quash his arrest and to suppress his inculpatory statement, alleging that the police used deception to lure him to the station, that once there, he was threatened and beaten, and that absent such abuse he would not have signed the statement. The motion was denied.

## A

In maintaining that the trial court was in error for not quashing his arrest, defendant cites the well-established principle that police may not use subterfuge to deceive suspects into relinquishing their constitutional protections, and suggests that the facts of his case support the presence of such deception. (See *People v. Daugherty* (1987), 161 Ill. App. 3d 394.) He relies on his testimony, as well as the testimony of his brother, to show that when the police arrived at his house, they told him that they wanted him to come to the station to identify the person who had stabbed him a few months earlier, when instead, they wanted him at the station in order to question him about, and arrest him for, Sax's murder.

*Daugherty*, however, is clearly distinguishable from the case at bar. There, Officer David Barts went to the defendant's home under the guise of investigating an earlier reported theft in order to determine if drugs or marijuana were in the home. Upon arriving at the home, Barts spoke with the defendant's wife, informed her that he was a juvenile officer, and that he wanted to ask her some questions about a theft of money which she had reported. Although she refused to allow Barts to come into the house, he did so anyway, and ordered her to show him where the money was taken from and where she kept other money around the house. Upon entering the kitchen Barts saw marijuana on the counter and seized it. He then called another officer and they searched the house for more drugs. Barts admitted that from reading other officers' reports about the theft he received information indicating the presence of marijuana in the residence.

The officers in the instant case went to defendant's house with the intention of asking him some questions about Sax's murder. Although they admitted to having knowledge about defendant's filing of a stabbing report a few months earlier, they claimed that they did not

tell defendant that their purpose was to have him identify the perpetrator when they removed him from his home on December 23, 1986.

■ A trial court's ruling on a motion to quash an arrest and suppress evidence will not be overturned unless it is manifestly erroneous. (*People v. Collins* (1989), 182 Ill. App. 3d 362, 364.) Based on the facts presented in this case, we cannot conclude that the trial judge's finding was clearly erroneous. The court was presented with the testimony of Officers Villardita and Kaminski, which it found to be more convincing than the contrary testimony of defendant and his brother, and our supreme court has repeatedly held that it is within the province of the trier of fact to determine the credibility of the witnesses before it and to resolve any conflicts in the evidence. (*People v. Collins* (1985), 106 Ill. 2d 237, 262, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267.) We therefore hold that the trial court was not in error in denying defendant's motion to quash his arrest.

## B

Defendant further asserts that the trial court was in error for not suppressing the admission of his inculpatory statement, because he was beaten and threatened into signing it. Citing *People v. Wilson* (1987), 116 Ill. 2d 29, 40, defendant notes that "when it is evident that a defendant has been injured while in police custody, the State must show, by clear and convincing evidence, that the injuries were not inflicted as a means of producing the confession." In *Wilson* the defendant testified that he was punched, kicked, smothered with a plastic bag, electrically shocked, and forced against a hot radiator, and there was evidence to corroborate his claims. Witnesses had observed 15 separate injuries on the defendant's head, torso and right leg; two different people who were at the police station testified that they had heard the defendant being physically and verbally abused and calling for help; and defense counsel presented extensive medical testimony and photographs illustrating the defendant's injuries.

■ Defendant asserts that the photographs illustrating the hole in the back of his shirt and the corresponding scabbed-over mark, his swollen lip, his swollen wrist, and his bruised hip all are factors which make it evident that he was injured while in police custody. We disagree. Unlike in *Wilson*, there are not the facts in this case to corroborate defendant's allegations. The police testified that they did not mistreat defendant in any way; he signed his confession in which he stated that he was treated well by the police; he did not tell Assistant State's Attorney Joyce or EMT Rose that he had been mistreated; nor was Public Defender Mullinex able to identify any signs of physi-

cal abuse in the pictures taken of defendant's face. When defendant was cross-examined regarding the photograph of his hip, he testified that it "look[ed] like no marks" were present. Moreover, during its deliberations, the jury had before it the photographs which showed where defendant had circled those portions of the photographs that allegedly indicated the injuries to his face, wrists and side, and it was unable to find that he had been injured while in police custody and therefore coerced into signing his statement. With respect to the hole in defendant's shirt and the corresponding injury to his back, no one could testify that defendant had been wearing the same shirt both at the time he was interrogated on December 23, 1986, and at the time his picture was taken on December 24, 1986. In fact, after defendant was taken to Cook County jail, where he was instructed to "remove the upper torso of clothing" and was examined by EMT Rose, Rose found no evidence of bruising.

For these reasons, we find it was not *evident*, as in *Wilson*, that defendant was injured while in police custody. Therefore, there was no need for the State to show by clear and convincing proof that defendant's injuries "were not inflicted as a means of producing the confession."

"Whether a statement is voluntarily given depends upon the totality of the circumstances[,] \*\*\* and the finding of the trial court \*\*\* will not be disturbed unless it is contrary to the manifest weight of the evidence." (*People v. Prim* (1972), 53 Ill. 2d 62, 70, *overruled on other grounds by People v. King* (1977), 66 Ill. 2d 551.) As stated in *People v. McCleary* (1990), 208 Ill. App. 3d 466, 476:

> "The test of whether a statement is admissible at trial is whether it has been made freely, voluntarily and without compulsion or inducement or whether the defendant's will was overcome at the time he confessed. [Citation.] Moreover, wrongful or coercive police conduct is a necessary precursor to finding that a confession is involuntary. [Citation.] The trial court need only be convinced by a preponderance that the confession was voluntary. [Citation.]"

■ In reviewing the totality of the circumstances, we hold defendant's confession was made voluntarily. First, defendant was not detained for any undue length of time. He was arrested at approximately 5:15 p.m. on December 23, 1986, and gave his inculpatory statement at approximately 7:40 p.m.; he signed the written statement at 9:15 p.m. Second, defendant's interrogation was not relentless. He was interrogated only a few times, each session lasting approximately 15 minutes. Third, defendant was not denied the

necessities of life—he was not treated inhumanely and was provided soda pop and cigarettes. Fourth, defendant was not deprived of counsel since he did not request an attorney even after he was apprised of his *Miranda* rights. Finally, defendant's age, education, emotional characteristics and experience in criminal matters all point to the fact that defendant's statement was not the product of coercion. Although defendant was 17 years old at the time of his arrest and did not have a criminal record as an adult, he had several arrests as a juvenile and had been adjudicated delinquent for theft and intimidation.

For the above-stated reasons, we find that the trial court was not in error in denying defendant's motion to suppress his inculpatory statement.

## II

Defendant further asserts that there was "[n]o evidence *** introduced at trial *** that any goods or money was [*sic*] taken from Mr. Sax by force or threat of force," and therefore, he was not proven guilty of armed robbery beyond a reasonable doubt. (Ill. Rev. Stat. 1985, ch. 38, par. 18—1.) Defendant's entire argument is premised on the fact that Sax voluntarily gave Simpson money to buy shrimp and voluntarily gave him money for marijuana but that there is no indication in the record that "money, jewelry, or the money clip was demanded from Mr. Sax while he was alive." Defendant cites authority for the proposition that in order to sustain a conviction for armed robbery, the force or threat of force must precede or be contemporaneous with the taking of the property (*People v. Patterson* (1972), 52 Ill. 2d 421), and argues that "[i]n the instant case it was established that Mr. Sax *voluntarily* delivered money to Erika Simpson, and to Darryl House." (Emphasis in original.)

Defendant overlooks, however, that the taking of Sax's money clip, which he admitted in his statement to Assistant State's Attorney Joyce, is clearly the act upon which the armed robbery charge is based. It was the taking of the money clip after defendant had shot Sax which constituted armed robbery.

> "It has been held that the force necessary to establish armed robbery is that which temporarily suspends the victim's power to exercise his will and cause him to part with his property. [Citation.] The force resulting in the armed robbery must either precede or be contemporaneous with the taking of the property. [Citation.] The evidence must show that the force employed 'was the means used by the robber' to take the property. [Citation.]

\*\*\* [T]he fact that the victim had been reduced to a state of physical nonresistance before the money was taken 'does not relieve the crime of the quality of robbery.' [Citation.]" (*People v. Washington* (1984), 127 Ill. App. 3d 365, 376-77.) Thus it is irrelevant in determining whether defendant robbed Sax that Sax voluntarily gave Simpson and defendant money prior to defendant's shooting Sax. Once it was shown that prior to taking the money clip defendant "suspended [Sax's] power to exercise his will," and "reduced [Sax] to a state of physical nonresistance before the money [clip] was taken," there was sufficient evidence to find defendant guilty of armed robbery. Therefore, on the facts of this case we hold that "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *People v. Collins* (1985), 106 Ill. 2d 237, 261.

### III

Defendant also maintains that during closing argument, the prosecution repeatedly misstated the evidence by (1) identifying co-defendant Simpson as defendant's girlfriend, and (2) arguing that T.B. saw defendant take a money clip from Sax after having shot him, noting that it is improper for the prosecutor to make arguments or assumptions which are not supported by the evidence. (*People v. Tipton* (1990), 207 Ill. App. 3d 688, 699, *appeal denied* (1991), 139 Ill. 2d 603.) He further charges that the prosecution improperly accused defense counsel of engaging in "desperate ploys [to] distract attention" from the true issue, by falsely accusing defendant of "trying to stare down" the assistant State's Attorney "for two minutes," and by characterizing defendant as a "hard ass," "good criminal," and "trying to avoid detection."

It is well settled that great latitude is afforded a prosecutor during closing arguments, the propriety of his remarks being left generally to the discretion of the trial court. (*People v. Morrison* (1985), 137 Ill. App. 3d 171, 184.) When there are allegations of prosecutorial misconduct, however, the arguments of both the prosecutor and defense counsel must be reviewed in their entirety and the comments must be placed in their proper context. (*Tipton*, 207 Ill. App. 3d at 701.) Generally "[i]mproper prosecutorial arguments '\*\*\* do not constitute reversible error unless they result in substantial prejudice to the accused' " (*People v. Shum* (1987), 117 Ill. 2d 317, 347, *cert. denied* (1988), 484 U.S. 1079, 98 L. Ed. 2d 1022, 108

S. Ct. 1060, quoting *People v. Baptist* (1979), 76 Ill. 2d 19, 29), or unless they are "a material factor in the conviction." (*Tipton*, 207 Ill. App. 3d at 700.) Moreover, where the trial court sustains defense counsel's objections to those comments, the court's actions obviate any prejudice (*People v. Washington* (1984), 127 Ill. App. 3d 365, 381), and "improper remarks not objected to at trial or specifically raised in a post-trial motion are deemed waived on appeal." *Morrison*, 137 Ill. App. 3d at 184.

■ Applying these principles to the facts of this case, it is clear from the record that defendant objected neither to the prosecutor's references to Simpson as defendant's girlfriend nor to the prosecution's statement that T.B. had witnessed defendant's taking the money clip from Sax. Therefore, the arguments made with respect to both of these comments are waived on appeal. As for the remaining remarks, objections having been made at trial and defendant having raised the issue in his motion for new trial, their propriety is properly before this court.

With respect to the "trying to stare down" the assistant State's Attorney "for two minutes," "hard ass," and "trying to avoid detection" remarks, the court sustained defense counsel's objections; thus, any potential prejudice to defendant was blunted. With respect to the "desperate ploy" and "good criminal" characterizations, although the court did not sustain the objections made, we find that neither of these comments, placed in their proper context, constitutes reversible error since they were not material factors in defendant's conviction. The State made the "desperate ploy" remark in response to defense counsel's earlier, unfounded insinuations that the State had "cut some deal with [T.B.]" in exchange for her testifying against defendant. The State made the "good criminal" remark when commenting on the evidence, suggesting that the jury should not reward defendant for being a "good criminal" because he did not leave behind his wallet, fingerprints, or any other physical evidence at the scene of the crime. We accordingly hold defendant's argument on this point to be without merit.

## IV

Finally, defendant argues that the trial judge abused his discretion by sentencing him to an extended term of 80 years. He contends that the evidence in this case fails to establish excessive brutal or heinous behavior indicative of wanton cruelty. Defendant cites *People v. Andrews* (1989), 132 Ill. 2d 451, as a case in which the supreme court reversed the trial court, holding that the conduct there

was not so exceptionally brutal or heinous as to justify the imposition of a more severe sentence. He raised this issue for the first time in his supplemental brief, which he was given leave of court to file.

Even if defendant had shown diligence by raising this issue in his opening brief, it would have been to no avail. At sentencing, it was determined that defendant had a prior juvenile record for assault, disorderly conduct, theft, residential burglary, and intimidation. He had received one year's supervision for the residential burglary charge. Also at sentencing, defendant spoke on his own behalf, saying only, "I feel as though I didn't have a fair trial." Based on all the evidence, the trial court in the case *sub judice* held that "it was a very brutal, heinous [crime,] indicative of wanton cruelty," basing its determination on evidence that defendant did not have "one sense of remorse," that this was "the most overwhelming case [it had] ever seen," that "all [Sax] had on him which wasn't all this much disputed, that you wanted to take the last thing was his life and you—which you did do. It is really sad, and all you can tell me, you didn't have a fair trial."

It is within the trial court's discretion to determine what constitutes "exceptionally brutal and heinous behavior indicative of wanton cruelty" for the purpose of imposing an extended sentence. (*People v. Edens* (1988), 174 Ill. App. 3d 1033, 1045, *appeal denied* (1989), 124 Ill. 2d 558.) We therefore hold that the trial court did not abuse that discretion and find that the case which defendant cites is inapposite.

Affirmed.

HARTMAN, P.J., and McCORMICK, J., concur.