THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CLIFFORD DOYLE, JR., *et al.*, Defendants-Appellants.

First District (4th Division)    No. 77-40

Opinion filed June 1, 1978.

Ralph Ruebner, of State Appellate Defender's Office, of Chicago, for appellants.

Bernard J. Carey, State's Attorney, of Chicago (Lee T. Hettinger, Iris E. Sholder, and James M. Thunder, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE ROMITI delivered the opinion of the court:

The defendants, Clifford Doyle, Jr., and Ernest J. Bramlett, were indicted for armed robbery and rape. A jury found each defendant not guilty of armed robbery but found each defendant guilty of rape. Bramlett was sentenced to 5 to 15 years and Doyle was sentenced to 10 to 30 years in the Illinois State Penitentiary. The only issues on review are:

(1) whether the trial court's failure to appoint separate defense counsel for the two defendants was error, the defendants being represented by the same court-appointed public defender in a joint trial;

(2) whether admission of testimony by a police officer that one defendant after his arrest said he was home when the crime occurred was prejudicial error, since that defendant did not testify and therefore could not be cross-examined by the other defendant.

No issue is raised as to the sufficiency of the evidence or as to the sentences imposed.

We find no prejudicial error and affirm.

While the defendants do not contend that the evidence was insufficient, a statement of the testimony is necessary to an understanding of the issues and their resolution.

Jeffrey Mardis, 19 at the time of trial, testified that he and his nine siblings were sleeping in their apartment at 5323 South Federal, Chicago, the Robert Taylor housing project, at 6 a.m., Friday, December 13, 1974. Jeffrey was sleeping in the front room, while the others were in the four bedrooms. His father did not live there and his mother was in the hospital. At that hour he was awakened by a knock on the door. After ascertaining

that it was the defendant, Clifford Doyle, whom he knew as a friend, Jeffrey opened the door and permitted Doyle to enter. A stranger, later identified as the defendant, Ernest Bramlett, accompanied Doyle. Bramlett said, "This is a stickup" and put a gun to the back of Jeffrey's head. Doyle went into one of the bedrooms where four sisters, Vanessa, 16, Tanya, 14, Sandra, 7, and Cherry, 5, were sleeping and shut the door behind him. Bramlett then took Jeffrey to another bedroom where Jeffrey's brothers, Carl, 17, and Paul, 17, were sleeping. Bramlett told them not to come out of the room so that nothing would happen to them; he said he had killed a person once before. Bramlett then left the room. Jeffrey heard his sister, Vanessa, crying. About an hour later, Bramlett told them they could come out of the room after they heard the front door close. When Jeffrey heard the front door close, he went to use the phone but the cord was cut so he went next door to call an aunt.

Carl and Paul likewise testified that Bramlett wielded a gun and made threats, and that they heard their sister screaming. Carl added that Doyle was related to two of the children.

Vanessa, 16 years old at the time of the incident, testified that she had been sleeping in her bedroom with three sisters. She was in a dress, as was her custom. She awakened, and saw Doyle sitting on the other bed. He asked her if she knew anything about killing. She said no and went to the door. Doyle pushed her backward with a knife. He told her that if she refused to have sexual intercourse with him something would happen to her brothers. He then opened the door so she could see Bramlett standing in the hallway with a gun. Doyle ordered her to lie on the bed and he penetrated her vagina. To smother her screaming, Bramlett came into the room and put a rag or towel in her mouth.

During the rape, Tanya was in the other bed. Sandra and Cherry joined her there after Doyle came in. Tanya testified that Doyle did indeed come into the room, that Vanessa went towards the door, that Doyle pushed Vanessa back with a knife, that he told her to lie on the bed, that she cried, that he lay on top of her, and that Doyle told Tanya to put her head under the covers. She was, however, able to see Bramlett enter and stick a rag in Vanessa's mouth. After about 30 minutes, Doyle called Bramlett into the room. Bramlett told Vanessa to come to the door, and Bramlett, Doyle, and Vanessa left the room. Doyle returned and told Tanya that he had "busted [her] sister wide open." Then he left.

Vanessa testified further that Bramlett then took her into her mother's bedroom, where no one was present, ordered her to lie on the bed, and proceeded to rape her. When he got up, he said, "[L]ook, you got blood all over me." She said she was sorry. Doyle came into the room and told her to wash herself. In the washroom she turned on the faucet, but did not wash, in anticipation of a medical examination; she watched television a

lot and knew that after one has sex against one's will you go to the hospital so they can take a smear. Then she was sent to the bedroom where Jeffrey, Carl, and Paul were. After they left, she could see the cut telephone cord, and Jeffrey called their aunt.

Police Officer Kutianski, who received the radio call, observed when he arrived that the cord connecting the receiver to the telephone had been cut. The rest of the apartment was not in disarray. He saw no bottles or cans. He did not notice any odor of alcohol or smoke. He immediately transported Vanessa to Billings Hospital.

Vanessa was examined by Dr. Joseph Bremer. She told him that she was forced at knifepoint to have intercourse with two different men. She believed the one to be 24 years old and the other one she did not know. He testified that he found fresh blood on the right thigh, a laceration of the perineum which is that portion of the body between the entrance to the vagina and the anus and two lacerations of the hymenal ring. He testified that Vanessa had probably been a virgin a few hours before.

Finally, Police Officer Robert Mason testified that shortly after midnight on February 20, 1975, he was alone with Doyle. Officer Mason reminded him that he was under arrest for the rape of Vanessa Mardis and advised him of his constitutional rights. Doyle said that, at about 6 a.m. on Friday, December 13, 1974, he was at home in bed with his wife, that he was in bed from 9 or 10 p.m. the night before and stayed in bed until noon. He could remember this because he had a doctor appointment on the 13th.

Defendant Doyle did not testify. Defendant Bramlett testified that he and Clifford Doyle did go to the Mardis apartment on the pertinent date. Doyle knocked on the door; Jeffrey Mardis let them both in. He, Doyle, and Jeffrey went to the kitchen. He could see Vanessa, three fellows, and a young lady in the living room talking. Jeffrey asked Bramlett for something "to get high off of," so Bramlett went down to the car and returned with wine and marijuana. Although a "joint" of marijuana was passed around, and the wine was opened, Vanessa did not partake of either at that time. After talking to her for a while Bramlett went with Vanessa to a bedroom. Some children were there; Vanessa put them in another room. He managed to get Vanessa to smoke and drink, then asked her to have intercourse with him. She pulled off her clothes, and, although she was nervous, they had intercourse. She screamed once, so her brother Jeffrey came in and grabbed Bramlett's shirt collar. A fight ensued. Doyle and "the rest of the people that was in the house" were at the bedroom door watching. Doyle was able to restrain Jeffrey, and Doyle and Bramlett left. Bramlett took his wine and "reefer" with him. Bramlett testified he never threatened Vanessa and never threatened anyone with a gun.

I.

■■ The defendants contend that they were denied the effective assistance of counsel because they were represented by the same counsel. It is clear that if the trial court erred in not appointing separate counsel, the case must be reversed. The assistance of counsel is among those constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error and if the refusal to appoint separate counsel is erroneous in a particular case, reversal must be automatic. (*Holloway v. Arkansas* (1978), 435 U.S. 475, 55 L. Ed. 2d 426, 98 S. Ct. 1173.) However, we find that the trial court, under the particular circumstances, did not err in failing to appoint separate counsel.

■■ ■ As a general rule, jointly indicted defendants should be tried together. (*People v. McCasle* (1966), 35 Ill. 2d 552, 221 N.E.2d 227; *People v. Holman* (1976), 43 Ill. App. 3d 56, 356 N.E.2d 1115.) Likewise one counsel in a case against multiple defendants can represent more than one defendant as long as the representation is effective and it does not appear that conflict of interest between or among defendants can be anticipated (*People v. Craig* (1977), 47 Ill. App. 3d 242, 361 N.E.2d 736), and the mere fact that defendants are to be tried jointly does not necessitate the appointment of separate counsel for each of them. (*People v. Thompson* (1977), 51 Ill. App. 3d 53, 366 N.E.2d 375; *People v. Hardemon* (1977), 46 Ill. App. 3d 1052, 361 N.E.2d 680, *appeal denied* (1977), 66 Ill. 2d 633; *People v. Normant* (1975), 25 Ill. App. 3d 536, 323 N.E.2d 553.) Codefendants are entitled to separate counsel when their positions are antagonistic (*People v. Craig* (1977), 47 Ill. App. 3d 242, 361 N.E.2d 736; *People v. Holman* (1976), 43 Ill. App. 3d 56, 356 N.E.2d 1115), but such antagonism is not necessarily present, merely by virtue of such representation, in every instance where the same attorney represents two or more codefendants. (*People v. Craig* (1977), 47 Ill. App. 3d 242, 361 N.E.2d 736.) On appeal, the defendants have the burden of showing that they had antagonistic defenses or that appointed counsel had other conflicts of interest in defending them during the criminal proceedings. (*People v. Hardemon* (1977), 46 Ill. App. 3d 1052, 361 N.E.2d 680, *appeal denied* (1977), 66 Ill. 2d 633.) A finding of adverse interests cannot be based on mere assertion and unless the defendant can establish that such conflict in fact existed at trial, this court will not indulge in speculation or conjecture to determine whether separate counsel was required. (*People v. Bass* (1968), 101 Ill. App. 2d 259, 243 N.E.2d 305, *appeal denied* (1969), 40 Ill. 2d 581.) We cannot and will not create a conflict of interest out of mere conjecture as to what might have been shown. *People v. Somerville* (1969), 42 Ill. 2d 1, 245 N.E.2d 461.

■■ In the instant case, we do not believe Doyle's position, even accepting the alibi, was so antagonistic to Bramlett that Doyle's counsel

could not represent Bramlett. Bramlett said he was at the apartment and had intercourse with Vanessa. He merely denied that he raped her. Doyle's position, even assuming Doyle contended that he was not there, was irrelevant to that defense. Likewise, we do not believe that Bramlett's position was so antagonistic to Doyle that his counsel could not also represent Doyle. We reach this conclusion whether we consider the trial as it actually transpired or whether we assume, indulging in the purest of speculation, that Doyle wished to testify that he had been home with his wife at the time in question even though Doyle never suggested to the court that he wished to present an alibi defense; his answer to discovery did not set out an alibi defense as required by supreme court rule and his attorney informed the jury in opening argument that the defense did not deny that Doyle was present in the apartment. Rather, we find the cases of *People v. Holman* (1976), 43 Ill. App. 3d 56, 356 N.E.2d 1115; *People v. Latimore* (1975), 33 Ill. App. 3d 812, 342 N.E.2d 209, *appeal denied* (1976), 62 Ill. 2d 591, and *People v. Precup* (1977), 50 Ill. App. 3d 23, 365 N.E.2d 1007, to be persuasive.

In *Holman* three defendants were charged with committing a robbery in Aurora. After his arrest, one of the defendants, Dunn, told the police that he and the two other defendants arrived in Aurora about 11:30 on that day to see a lady, stopped at a restaurant and left Aurora about 2:30; the robbery occurred at about 10 that morning. The State moved to sever Dunn's case from that of his codefendants because it wished to use the statement. Defense counsel responded that he was ready for trial. The trial court denied the motion. At trial, Dunn testified but his codefendants, who had also pleaded not guilty, did not. The State by its evidence that the defendants were arrested at noon refuted that portion of Dunn's statement that they were in Aurora at 2:30 p.m. All three defendants were found guilty. The appellate court held that the trial court had not erred in its refusal to sever the defendants' cases or to appoint separate counsel, pointing out that while Dunn's statement placed all three defendants in Aurora on the date of the robbery, this fact alone could not be considered as an implied admission that the defendants committed the robbery and absent any showing that Dunn's statement incriminated his codefendants, they had failed to otherwise demonstrate the antagonistic nature of their defenses.

Likewise, in *Latimore*, the two defendants along with some others were accused of rape. Vesey pled not guilty and presented no evidence. Latimore testified that they had been there and that he had had intercourse with the complaining witness, at her urging, after Vesey and the others had left. The reviewing court found that the codefendants had not had a right to separate counsel as their interests were not in fact antagonistic nor their defenses inconsistent.

In *Precup*, three defendants were charged with an armed robbery which occurred at 12:30 a.m. Two of them, Harness and Brummell were represented by the same public defender. At the trial, Precup, Harness and Brummell presented testimony that each was at a certain tavern, arriving at different times between 7 p.m. and 10:30 p.m. Several other witnesses for the defense also testified to their presence there. Precup and Harness testified that all three were together at the tavern. Harness testified that the three stayed there until closing time at 1 a.m. and that they then went to Precup's apartment where they stayed until 2 a.m. Precup and a girlfriend Pam testified that they left about 11 p.m. and at about 1 a.m. Harness and Brummell came to their apartment and stayed for about an hour. Brummell did not testify but an out-of-court statement of his in which he stated he had seen neither Precup nor Pam that evening, that he and Harness had left the tavern at closing and had driven around was introduced. All three defendants were found guilty. Harness and Brummell on appeal contended that because of their conflicting alibi statements they were denied effective assistance of counsel since they were represented by the same attorney. The appellate court disagreed, pointing out that the defenses were not antagonisic.

*United States v. Carrigan* (2d Cir. 1976), 543 F.2d 1053, cited by the defendants, while involving a similar factual situation, is not persuasive, nor, being a federal case, is it binding on this court. The defendants in *Carrigan* were convicted of knowingly and unlawfully transporting stolen goods in interstate commerce. Carrigan testified that he and White, the codefendant, had in Massachusetts arranged the sale of the goods involved but that they had not known the goods were stolen. White did not testify. However the prosecution introduced into evidence a statement White made to an FBI agent that he had spent the evening in question with Carrigan at the latter's apartment in New York. The Court of Appeals reversed the conviction of both defendants since they had been represented by the same attorney pointing out that it is the rule in that circuit that where the same attorney represents several defendants, the trial judge must conduct a hearing to determine whether a conflict exists to the degree that the defendants may be prevented from receiving the representation guaranteed by the Sixth Amendment and the defendants must be fully advised by the trial court of the facts underlying the potential conflict. In *Carrigan* the trial court had made no inquiry at all. This is not, however, the law in Illinois. In *People v. Craig* (1977), 47 Ill. App. 3d 242, 361 N.E.2d 736, the court in a well-considered opinion rejected the defendants' contention that the court should adopt a rule requiring a trial judge in criminal cases involving multiple defendants, to make an on-the-record inquiry into potential conflict of interest and to admonish defendants of the inherent dangers where a single attorney

represents more than one defendant. The court instead pointed out that the primary responsibility for the ascertainment and avoidance of conflict situations lies with the members of the bar and it is not necessary—until some evidence of conflict or antagonism appears—for the trial court to inquire into such representation and then to call to the attention of the defendants the potential danger of multiple client representation. Likewise we note that our supreme court in *People v. McCasle* (1966), 35 Ill. 2d 552, 221 N.E.2d 227, pointed out that *Glasser v. United States* (1942), 315 U.S. 60, 86 L. Ed. 680, 62 S. Ct. 457, was inapposite in a case where the defendant had made no objection to joint representation either before or during trial. Accord, *People v. Bass* (1968), 101 Ill. App. 2d 259, 243 N.E.2d 305, *appeal denied* (1969), 40 Ill. 2d 581.

■■ We believe, that in the ordinary case, the defendant should not be allowed to remain silent and make no attempt to suggest either to his attorney or to the court any facts which would alert them to the fact there is a conflict of interest and then on appeal demand a reversal and a second trial because different evidence might have been presented had there been separate counsel. As the court in *People v. Bullock* (1977), 51 Ill. App. 3d 149, 155, 366 N.E.2d 475, 479, remarked, "[a]lthough defendant in his brief suggests that 'other divergent and unhampered defenses' might have been employed, had he and Flowers been represented by different counsel, this is mere speculation" and "[w]e will not disturb a judgment on the basis of such conjectural or speculative conflicts of interest of codefendants envisioned for the first time on appeal." *People v. Craig* (1977), 47 Ill. App. 3d 242, 248, 361 N.E.2d 736, 742.

## II.

Bramlett also contends that Officer Mason's testimony that Doyle told him he was at home at the time of the crime was, as to Bramlett, highly prejudicial hearsay since its only relevance was to show Doyle was at home when Bramlett testified Doyle was with him, thus impeaching Bramlett's testimony and therefore, under *Bruton,* was improperly admitted since Doyle could not be cross-examined.

To begin with, the defendant Bramlett is in error when he contends the purpose of the testimony was to prove Doyle was at home when the crime occurred. If the State proved that, then the State proved Doyle was innocent. Obviously that was not the State's intent when it produced the testimony. We do question the relevancy of the testimony, since it came from the State and was not introduced to show the truth of the statement, but neither defendant ever objected to its introduction.

■■ Bramlett is also in error when he says the statement was hearsay. Hearsay is an extrajudicial statement offered to prove the truth of what is asserted in the statement. (Cleary, Handbook of Illinois Evidence §§17.1,

17.4 (2d ed. 1963).) The only reason the testimony complained of was admitted was to show Doyle made the statement, not that the statement was true. And when the mere making of the statement is the significant fact, hearsay is not involved. (Cleary, Handbook of Illinois Evidence §17.4 (2d ed. 1963).) The veracity of the original speaker, Doyle, is not at issue here since the question is not whether the original statement was true. The issue is the veracity of the listener who testified that he heard the statement, and that witness, Officer Mason, could be and in fact was cross-examined. Accordingly, the defendant Bramlett was not denied the right to cross-examine the witnesses against him.

It is obvious that the jury did not misunderstand the relevance, or lack of it, of Officer Mason's testimony since Doyle was convicted of the crime. Had the jury believed the testimony proved Doyle was at home at the time, they would have had to acquit Doyle.

*Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, is not applicable for another reason also. That case bars the use of "powerfully incriminating extrajudicial statements" of a co-defendant (391 U.S. 135, 20 L. Ed. 2d 485, 88 S. Ct. 1628), where the speaker is not available for cross-examination. There was no "powerfully incriminating extrajudicial statement" in this case. Doyle merely told Mason he was at home. He did not say Bramlett went to the Mardis apartment. Bramlett said that. Furthermore, he in no way contradicted Bramlett's statement that Vanessa willingly had sexual intercourse with him.

We recognize that the prosecutor in final argument pointed out that if Bramlett was telling the truth, Doyle had told a completely different story. Even assuming the jury would infer from that argument that Doyle lied because he was afraid or had a guilty conscience, which is unlikely, it does not follow that they would infer that Bramlett, who did not lie to the police, had a guilty conscience and therefore must be guilty.

■■ Finally, even if in light of the prosecutor's final argument the admission of Mason's testimony, which was not objected to, should be deemed error, any error is harmless beyond a reasonable doubt in light of the overwhelming evidence of guilt.

Accordingly, the judgment of the trial court is affirmed.

Affirmed.

JOHNSON, P. J., and DIERINGER, J., concur.