THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHRISTOPHER RICHEE, Defendant-Appellant.

First District (3rd Division)    No. 1—03—0136

Opinion filed January 19, 2005.

Michael J. Pelletier and Adrienne N. River, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, James

E. Fitzgerald, and Michelle Katz, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE KARNEZIS delivered the opinion of the court:

Following a jury trial, defendant Christopher Richee was convicted of first degree murder and was sentenced to life imprisonment. On appeal, defendant argues: (1) the trial court improperly admitted other crimes evidence; (2) the trial court erred in denying his motion in *limine*; (3) the trial court improperly admitted evidence that was irrelevant and prejudicial; (4) the prosecutor made improper remarks during closing argument; and (5) he was denied a fair trial by the cumulative effect of errors. We find that the admission of other crimes evidence and the quantity of evidence presented relating thereto was error.

## BACKGROUND

Nan Toder, a Florida resident, was visiting the Chicago area, training for her new position as vice-president of Vance Wholesale Floral Company (Vance) in Florida. Toder arrived in Chicago on December 9, 1996, and was staying in Room 227 at the Hampton Inn in Crestwood, Illinois. She was to return home to Florida on December 13, 1996.

On the evening of December 12, 1996, Toder declined a dinner invitation with the president of Vance, went to a nearby gym, and then visited Jewel Food Stores where she made several purchases at 8:25 p.m. She returned to the hotel at approximately 8:54 p.m. and entered the hotel through the front lobby area alone. She was carrying a Wendy's bag and asked the front desk for a 5 a.m. wake-up call the next morning. She spoke with her mother on the phone at 9:56 p.m.

The body of Nan Toder was discovered on the morning of December 13, 1996. The victim of murder, she had been strangled with a pair of panty hose, bound with telephone cords and slashed in the back of the head several times causing massive bleeding. Her body was found on the floor between two beds.

Defendant, the maintenance manager of the Hampton Inn in Crestwood, was indicted for the murder in December of 1999.

## EVIDENCE AT TRIAL

Defendant is not challenging the sufficiency of the evidence in this case. Therefore, we will discuss only those facts relevant to the disposition of this appeal.

On the morning of December 13, 1996, two wake-up calls to Toder's room went unanswered. Concepcion Dominguez, a housekeeper employed at the Hampton Inn, was making her rounds on the morn-

ing of December 13, 1996. At about 10:15 a.m., Dominguez knocked on the door of Room 227. There was no response, so Dominguez used her metal key to access the room. Her metal key opened all of the hallway doors on the second floor. The door to Room 227 would not open. She then summoned her supervisor, Mirta Arroyo. Arroyo also tried to open the door of Room 227 with her metal key but the door only opened slightly. Arroyo then knelt down and pushed away what was on the other side of the door, and the door opened. It appeared that a suitcase had been blocking the door. Once the door was fully open, Dominguez noticed that there was blood all over the bed. When Arroyo saw blood on the bed, she told Dominguez to go down the hallway. Arroyo summoned hotel manager Brenda Randazzo. Arroyo and Randazzo returned to Room 227 and Randazzo used her master key to unlock the door. Upon entering the room a second time, the two viewed the body of Nan Toder lying between the two beds and quickly exited the room. Defendant came to Room 226, where staff members had congregated, and asked what was going on. Randazzo informed defendant that there had been a murder and instructed him not to enter Room 227. Arroyo then observed defendant use his key to enter Room 227. He came out several seconds later.

Crestwood police officer John Barolga was on patrol on December 13, 1996, when he received a call of a possible homicide at the Hampton Inn. When he arrived, he was greeted by defendant, who took him to the second floor and directed him to Room 227, where he opened the door with a key. Defendant stated that he did not have any knowledge about where the victim was located within the room. Officer Barolga ordered defendant to stay out of the room.

Officer Barolga entered the room and noticed the black suitcase just inside the door. He also saw, immediately to his right, a door that led to Room 229, an adjoining room. He proceeded into the room and saw a bloody pillow and bedspread on the bed closest to the door. Officer Barolga also observed a towel on the bathroom floor that appeared to have blood on it. While he was in the bathroom looking around, he observed defendant enter the room, pass the bathroom where he was standing, and continue moving toward the main room. Officer Barolga again ordered defendant to stay out of the room. Defendant then backed up and stopped in the vicinity of the doorway. Office Barolga again ordered defendant to leave.

Officer Barolga saw Toder's dead body lying on the floor between two beds. Toder lay on her back, propped up on her elbows with her head tilted back. She was wearing a robe, which was open, exposing her breasts and pubic area. Her neck was bound by panty hose and a phone cord was wrapped around her left wrist. A bedspread partially

covered her legs. He later observed that Toder's feet were also bound with a phone cord.

Dexter Bartlett was found qualified by the court to testify as an expert in crime scene investigations. He responded to the Hampton Inn at approximately 10:33 a.m., on December 13, 1996, and viewed Toder's body in Room 227. He indicated that her injuries were not readily apparent but that her body had been "posed." Based on his observations, he opined that Toder was attacked while lying facedown on the bed closest to the door. In addition, based on the blood transfer patterns found on the bed, he opined that the offender used a machete and had worn gloves.

Bartlett also observed that Room 227 was in disarray. Items appeared to have been thrown on the floor after Toder was attacked. He opined that the crime scene was "staged."

Bartlett examined the locks on the outside of the door to Room 227. He observed that the door had two locks on its exterior; an upper locking device that was operated by a key card and a lower locking device that was operated by a metal key. There were marks and partial damage to the lock operated by a metal key. Bartlett opined that the marks were made by someone inserting a screwdriver or other similar device and moving it up and down. Filings were found on the carpet in the hallway outside Room 227. Despite the damage, the lock was still in good working order.

There were three locking devices on the inside of the door in Room 227 leading to the hallway. The uppermost locking device was a security lock which could only be activated from inside the room and which could not be opened with a key. It would allow the person inside the room to open the door slightly to look outside into the hallway. The second lock was a deadbolt that could only be activated from inside the room. The third lock was a passive door lock that automatically locks from the outside if the door is closed. All three locking devices were in working order on the morning of December 13, 1996.

Bartlett initially concluded that the point of entry into Toder's room was the door leading from the hallway to Room 227. At that time, however, Bartlett was unaware that the housekeeping staff had initially been unable to get that door open because of the suitcase that was right inside the door. After learning this information, Bartlett opined that the point of entry into Toder's room was the door from adjoining Room 229.

The deadbolt on Toder's adjoining door was found locked. There was no way to unlock the deadbolt on Toder's adjoining door from inside Room 229. If the small metal bar from the deadbolt lock on Toder's adjoining door were removed, the lock would appear to be

locked although it would actually be disconnected. In addition to deactivating the deadbolt on the adjoining door, a person seeking to gain entry into Toder's room would have to place tape on the striker bolt or on the hole in the door frame. This would have to be done before Toder entered her room.

Bartlett also believed that it would be impossible for Toder's killer to leave her room through the hallway door because of the suitcase. In order to exit, the killer would have to again take apart the locking mechanism in Toder's adjoining door, replace the metal bar and remove the tape. The killer would not be able to lock the deadbolt on Toder's adjoining door if he was in Room 229. He would have to come back into Toder's room later and lock the deadbolt on her adjoining door.

Rod Englert, an expert in the field of crime scene reconstruction and bloodstain interpretation, viewed reports and approximately 400 photographs from the crime scene, as well as individual articles of clothing and bedding taken from Room 227. Englert opined, based on his examination of all of the items, that Toder was sleeping, lying facedown on the bed closest to the door with her head at the head of the bed when she was approached from behind. Englert also opined that the massive amount of blood on the bed came from multiple blows to Toder's head. Given that the wounds on Toder's head were parallel, Englert believed that Toder did not fight back. He also opined that the wounds to Toder's head were caused by a machete. The bloody imprint of a machete was left on the bedsheet. The offender likely wore gloves because no fingerprints were recovered from the sheet. DNA samples were taken from the bedsheet and none of the DNA matched that of defendant.

With respect to the position of the body, Englert opined that after the attack, Toder's body was pulled from the bed onto the floor. Englert testified that Toder's body had been posed.

Lisa Dellorto was working at the front desk of the Hampton Inn on the evening of December 12, 1996, from 11 p.m. to 7 a.m. She received a telephone call from defendant shortly after she arrived at work. Defendant told Dellorto that he was at Bongo Johnny's, a bar and dance club in Chicago Ridge, Illinois, and asked Dellorto if she wanted him to bring her a burrito. Dellorto said no. Defendant said he was coming to the hotel anyway and was bringing a burrito for himself.

Shortly thereafter, defendant arrived at the hotel. Dellorto was in the guest lobby area and did not see defendant enter through the main hotel entrance but saw him standing at the front desk. Defendant was dressed in a dark sweater, jeans and white tennis shoes. Defendant's tennis shoes struck Dellorto as being unusual because

prior to that evening she had seen defendant wear dirty shoes, so Dellorto asked defendant about his shoes. Defendant told her that he got them for Christmas from his mother and rarely wore them. They then went to the back office to talk. Later, she saw defendant looking at the hotel's computer, which was used strictly for hotel information. Looking at the hotel computer, one could determine which rooms were occupied. Dellorto last saw defendant on December 13, 1996, at approximately 12:30 p.m., when defendant told her that he was going to turn on the hotel's outside Christmas lights.

Dellorto also testified that she was familiar with the key system at the Hampton Inn. A master key was kept at the front desk. Any employees who came in through the front desk area would have access to that key.

Brenda Randazzo testified that she was the general manager of the Hampton Inn on December 12, 1996. On December 12, 1996, defendant worked his normal hours of 7 a.m. to 3:30 p.m. As manager, she was familiar with the locking systems in the hotel. Randazzo had a master metal key that could open the lock on the outside of a hotel room door. The key would operate even if the deadbolt lock was activated. The other department managers, including Wendy Heberling, the assistant manager, Mirta Arroyo, the executive housekeeper, and defendant, had master keys. There was a fifth master key that was kept in a locked box on the wall in the back office. This key was still in the locked box on the morning of December 13, 1996. The key that was kept at the front desk was not capable of overriding a deadbolt on the hotel room door.

A new locking system came into effect at the Hampton Inn on December 13, 1996, in the afternoon. A meeting was held on December 12, 1996, regarding the new locking system. A representative of the company installing the new locking system was present at the meeting and explained to the hotel staff, including defendant, how the new locks would work.

The new locking system was a computerized electric locking system. A new lock was to be installed on the outside of each hotel room door. The managers would receive new master key cards. The managers' master cards would be capable of circumventing the same locks that they circumvented under the old system. The computerized locking system would record information as to whose key was used to enter a hotel room, if it was a guest key, a maintenance key or a housekeeping key, and the time the key was used to enter the room. This information would not be available from the locking system as it existed on December 12, 1996.

Jill Paoletti testified that she and defendant were dating in

December of 1996. At approximately 8:30 p.m. on the evening of December 12, 1996, she went to defendant's house in Burbank, Illinois. She left defendant's house at approximately 11 p.m. that same evening after defendant complained of having a stomachache.

Paoletti had a conversation with the police on December 16, 1996. Following that conversation, Paoletti spoke with defendant. She asked him if he had gone out on the evening of December 12, 1996, after she left his house. Defendant stated that he went out to get a burrito because he was hungry. Paoletti found this "unusual" considering that defendant was not feeling well and he normally did not eat late in the evening.

Paoletti testified on cross-examination that during the three years she dated defendant, she was in defendant's bedroom two or three times a week. Paoletti saw a hunting knife with a serrated blade in defendant's bedroom. The knife was approximately eight inches long but could have been longer. She also testified that she had sexual relations with defendant several times during her menstrual period. Defendant would clean himself with a towel and put the towel on the floor next to the bed. Paoletti could not recall if she was menstruating the week that Toder was murdered.

Patricia Yodka testified that she was having a secret relationship with defendant in December 1996. She normally met defendant and his friend Mike Duello on Tuesday and Thursday nights at Bongo Johnny's. Yodka would then go to defendant's house. In the first week of December 1996, defendant shaved his legs, pubic hair, armpits and facial hair but not his head hair.

On Thursday, December 12, 1996, Yodka went to Bongo Johnny's but defendant did not show up. At 2:30 a.m., on the morning of December 13, 1996, Yodka went to defendant's house and knocked on his bedroom door, which was accessible from the outside. Defendant answered the door and told Yodka that "tonight's not a good night, that I have puke all over me, and he shut the door."

Yodka also testified that during her relationship with defendant, defendant would ask her to pose nude. He wanted Yodka to lie on her back with her arms back, her knees bent, her legs sprawled open and her head either up or back. Defendant also once took a picture of her while she slept.

Defendant's friend, Michael Duello, testified that on the evening of December 16, 1996, defendant called him, telling him that the police were going to search defendant's house, and asked Duello to remove a bloody towel from his bedroom. Duello disposed of the bloody towel in a Dumpster.

About a week later, Duello went to defendant's house. He noticed

that the machete that defendant normally kept in a cargo net was no longer there. Later, in the garage, Duello saw the blade of a machete that resembled the one he had previously seen in the cargo net, but the handle was missing. Duello asked defendant what happened to the machete and defendant told him he was "screwing around with it and the handle broke." Duello asked defendant if he had "killed the girl." Defendant asked Duello what he thought and, when Duello said "no," defendant said "stick with that." Duello again asked defendant whether he had done it, and defendant told him no, and then yes, and then no.

Jill Alexejun testified that she and defendant dated in 1994. During that time Alexejun worked as an assistant manager for the Lincoln Property Company. Defendant worked as a maintenance technician for the same company. As part of defendant's job with the company, he changed locks on apartment doors. Alexejun saw defendant gain access to vacant apartments on several occasions. If the knob lock was locked, defendant used a screwdriver to unlock it; if the deadbolt was locked, he used a drill. She also testified that she witnessed defendant unlock a door with a credit card.

Dr. Cogan, the medical examiner, testified that he performed the autopsy on Toder. The parties stipulated to Dr. Cogan's expertise in the field of forensic pathology. Dr. Cogan determined that the cause of death was multiple injuries. Dr. Cogan also testified that the cuts to Toder's head could have been caused by a machete. Dr. Cogan could not determine the exact time of death.

The State presented evidence of other crimes. Two witnesses testified about a burglary that had occurred at Hollywood Park, an amusement facility in Crestwood, Illinois (the Hollywood Park burglary), in the spring of 1992. Six witnesses testified regarding burglaries that occurred at the Old Willow Springs Shopping Center (the Willow Springs burglaries) on March 9, 1998.

A jury convicted defendant of first degree murder. The court sentenced defendant to life imprisonment.

## ANALYSIS

Defendant first contends that the trial court erred in admitting evidence of defendant's two prior burglaries under the *modus operandi* exception because they did not share with each other, or with the murder, such distinctive features that they tended to prove defendant guilty of murder. In the alternative, defendant argues that even if the other crimes evidence was properly admitted to establish *modus operandi*, the evidence was more prejudicial than probative.

■ Generally, evidence of other crimes is inadmissible where that

evidence is relevant solely to demonstrate defendant's propensity to engage in criminal activity. *People v. Heard*, 187 Ill. 2d 36, 58, 718 N.E.2d 58, 70 (1999). This is because "[s]uch evidence overpersuades the jury, which might convict the defendant only because it feels he or she is a bad person deserving punishment." *People v. Lindgren*, 79 Ill. 2d 129, 137, 402 N.E.2d 238, 242 (1980). Such evidence is admissible, however, where relevant for any purpose other than to show the propensity to commit crime. *People v. Illgen*, 145 Ill. 2d 353, 365, 583 N.E.2d 515, 519 (1991).

Evidence is relevant generally if it has any tendency to make the existence of a fact of consequence more probable or less probable than it would be without the evidence. *People v. Peeples*, 155 Ill. 2d 422, 455-56, 616 N.E.2d 294, 309 (1993). Evidence of other crimes is relevant to prove *modus operandi*, intent, identity, motive or absence of mistake. *People v. McKibbins*, 96 Ill. 2d 176, 182, 449 N.E.2d 821, 823 (1983).

> "The *modus operandi* or 'method of working' exception refers to a pattern of criminal behavior so distinct that separate offenses are recognized as the work of the same person. [Citation.] Between the offense offered to prove *modus operandi* and the offense charged, there must be a clear connection which creates a logical inference that, if defendant committed the former offense, he also committed the latter. [Citation.] This inference arises when both crimes share peculiar and distinctive features not shared by most offenses of the same type and which, therefore, earmark the offenses as one person's handiwork. [Citation.] The offenses need not be identical but must share features which, although common to similar crimes in general, are distinctive when considered together." *People v. Berry*, 244 Ill. App. 3d 14, 21, 613 N.E.2d 1126, 1132 (1991).

When evidence of other crimes is offered, even if relevant for a permissible purpose, it may be excluded if its prejudicial effect substantially outweighs its probative value. *Heard*, 187 Ill. 2d at 58, 718 N.E.2d at 70. A trial court should exclude other crimes evidence when the prejudicial effect substantially outweighs the probative value. *Illgen*, 145 Ill. 2d at 365, 583 N.E.2d at 519. The admissibility of other crimes evidence rests within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. *People v. Robinson*, 167 Ill. 2d 53, 63, 656 N.E.2d 1090, 1094 (1995).

### The Hollywood Park Burglary

Patrick Brennan testified that he and defendant were friends in March 1992. During that month, he and defendant had a conversation wherein defendant indicated that he was considering breaking into Hollywood Park to steal money from the office safe and asked for

Brennan's help. Defendant was a manager at Hollywood Park at that time. Hollywood Park is an amusement facility containing video games and miniature golf located in Crestwood, Illinois. Defendant told Brennan that he wanted to make the burglary look like it was not an "inside job."

About a week later, Brennan and defendant had another conversation. Defendant told Brennan that he had figured out a way to get into the safe and showed Brennan a plastic key. Brennan described the key as being "clear plexiglass" hanging on a string from defendant's mirror. Defendant told Brennan that he had made a copy of the key that the armored car drivers used to get into the safe by heating up a piece of plexiglass, sticking it in the hole and grinding it down. Defendant indicated that he had tested the key in the safe and that it worked. Defendant told Brennan to dress in normal clothes with black clothes over them and to bring a pair of gloves.

The next day defendant called Brennan at approximately 6 p.m. and told him that he would be picking him up. Defendant arrived at Brennan's home at 9 p.m. The two transferred what Brennan believed to be a hoe from defendant's truck to the trunk of another vehicle and left for Hollywood Park. Defendant stated that he had borrowed the hoe from Hollywood Park and was using it as an excuse to go there.

When they arrived, defendant pulled the car around the back. Defendant went in through the front and indicated that he was going to open the back door. Defendant then came through the back door, came to the trunk of the car and removed the hoe. Defendant and Brennan went into the building's maintenance room through the back door. Once inside, defendant instructed Brennan to use the ladder inside the maintenance room to access the roof. Defendant went to park the car, returned on foot and joined Brennan on the roof. They waited for the park to close. Defendant had in his possession a backpack with tools including a chisel, hammer, tin snips, needle-nose pliers, flashlight and a rope, and a two-way radio.

Once the park closed, defendant paced off a location on the building's roof above the office where he wanted to cut a hole. Defendant then kicked the stones away and started to cut. Brennan observed defendant "beat a hole with the chisel to get it started and use tin snips to open it up." After defendant began to cut the hole, Brennan acted as a lookout. Both defendant and Brennan were wearing gloves.

After the hole was cut, defendant went into the building through the hole. A minute or two later, defendant began handing bags of money to Brennan through the hole in the roof. Defendant handed three bags of money and the safe door to Brennan. Defendant then

climbed back through the hole and onto the roof. Defendant threw the safe door over the west side of the building. The bags of cash were put into defendant's backpack. Brennan and defendant got down from the roof by scaling the wall using a rope looped around an air-conditioning unit. Once they got down, they were able to free the rope from the air-conditioning unit. Defendant then retrieved the safe door and the two went to the car, which was parked less than a mile away.

At the car, defendant and Brennan stripped off their black clothing and put everything, including the bags of cash and the safe door, in the trunk. Defendant then drove to a body of water at Ridgeland Avenue and threw the safe door in. They then proceeded back to Brennan's house, where defendant gave Brennan one of the bags, which held approximately $5,000 to $7,000 in cash. Defendant kept the other two bags, which Brennan estimated contained $18,000 to $20,000. Defendant told Brennan that if anyone began asking questions regarding the burglary "it never happened." During the middle of the night that same night, Brennan remembered that defendant left the radio on top of the building. He called defendant the next morning to tell him and defendant said he would take care of it.

Chris Paliga testified that he is the current owner of Hollywood Park and has owned it since 1996. In April of 1992, Paliga was the general manager of Hollywood Park. Defendant was the manager. Paliga testified as to the general layout of the building and the surrounding premises. He testified that the back door of the building leads to a maintenance room. Inside the maintenance room is a ladder that provides access to the roof. He also gave testimony in great detail regarding the building's security system. Given his managerial position, defendant knew that there was no alarm system on the second floor.

There were two safes in the office. One safe had only two keys: one was kept in the manager's safe and the other was in the possession of the armored car service. The second safe was used on a daily basis for change and had a combination lock. Paliga identified photographs of the safe as it existed in 2002 showing that the door had been replaced. He was also shown photographs of the two safes as they existed in 1992.

On April 20, 1992, defendant called him and told him that someone had burglarized the building. Defendant sounded upset. Defendant told him that there was a hole cut in the roof in the office area, a desk was standing on its side and some things had been tossed around. When Paliga arrived at Hollywood Park, he saw that defendant was upset. Defendant stated that he could not believe someone would do something like that. He spent most of the morning trying to calm

defendant down. The police who investigated the scene opined that the hole in the roof was cut from the inside.

## The Willow Springs Burglaries

Willow Springs police officer Paul McGrath testified that on March 9, 1998, he responded to the report of a burglary at the Old Willow Shopping Center in Willow Springs, Illinois. The Old Willow Shopping Center is a three-story commercial building housing 10 to 25 businesses.

Officer McGrath spoke with the business owner who reported the burglary. He observed that the door to the business was broken in. There was physical damage to the doorway. Officer McGrath noticed that gang graffiti had been spray painted on the walls of the second-floor hallway and down the stairwell. Officer McGrath believed the graffiti to be "fake." At the bottom of the stairwell was a door leading outside. He examined the door and observed that there was duct tape over the latch of the door to prevent the locking mechanism from catching. Officer McGrath was shown 20 photographs of the premises depicting the graffiti in the hallways and stairwell.

Robert Zygmunt testified that he and defendant were friends. In March of 1998, he helped defendant prepare for the opening of defendant's tanning spa. The tanning spa was located on the second floor of the Old Willow Springs Shopping Center. Later that same month, defendant came to Zygmunt's house with several Gateway computers, including towers, printers and keyboards, as well as a wastepaper basket filled with various other office-related items. Defendant told Zygmunt that he had stolen the equipment from a business in the building where his tanning spa was located. Defendant asked Zygmunt to hold onto the equipment because he was being investigated by the police. Defendant told Zygmunt that he could do whatever he wanted with one of the computers, but he wanted Zygmunt to hold onto the other one because he wanted it back at some point in time. Zygmunt sold one of the computers for $100. Defendant told Zygmunt that if the police came asking questions about the computers, he should tell them that defendant bought them at the flea market. The police eventually interviewed Zygmunt and he turned the remaining computer over to them.

Mary Ann Racilla testified that she owns an environmental consulting firm called Environmental Assessment Group that is located on the third floor of the Old Willow Springs Shopping Center. Defendant's tanning spa was on the second floor of the building. On March 9, 1998, she arrived at the building and noticed that graffiti had been painted in the hallway. Her office had been vandalized and

several things had been stolen from her office, including a printer. The locking mechanism on the door that led to her business was operable after the burglary.

David Lucado testified that he is employed by Comprehensive Planning, Inc., located on the third floor of the Old Willow Springs Shopping Center across the hall from Environmental Assessment Group. On March 9, 1998, when he arrived at work he noticed that the door to the office was open and that several items were missing from the office, including two computers and a fax machine.

Edward Doyle of the Cook County sheriff's police department testified that on May 21, 1999, he executed a search warrant on the tanning spa owned by defendant located in Old Willow Springs Shopping Center. Officer Doyle found a fax machine in the bottom drawer of a file cabinet. The fax machine was missing its serial number.

Thomas Weatherald testified that he was employed with the Illinois State Police on May 21, 1999. On that date, he had occasion to execute a search warrant on defendant's home at 8136 South Mobile in Burbank, Illinois. In the defendant's bedroom, Weatherald discovered a set of speakers for a Gateway computer and a printer. These items, proceeds from the burglaries, were returned to their rightful owner.

## Modus Operandi Analysis

The State urges us to find that the trial court properly admitted the other crimes evidence because substantial similarities existed between the instant offense of murder and the prior offenses of burglary to admit them under a theory of *modus operandi* in order to establish identity. Specifically, the State offers five similarities between the Hollywood Park and Willow Springs burglaries and the offense in the instant case. First, the defendant was an "insider," a person having more than ordinary access to all three locations. Second, defendant possessed the ability to commit the offenses due to his knowledge of how to defeat locking mechanisms. Third, defendant masked all three crime scenes, leaving false leads for police in an attempt to divert their attention away from him. Fourth, defendant was a "secondary" victim. Finally, defendant enlisted the assistance of his friends.

In *People v. Clay*, 349 Ill. App. 3d 24, 811 N.E.2d 276 (2004), the defendant was convicted of first degree murder and an armed robbery that occurred at a currency exchange. The evidence at trial established that the defendant and two other men entered a currency exchange together. One asked for change for a dollar and after receiving the change picked up the receiver of a pay phone located therein. The two other men left the exchange and the man who received the change left

shortly thereafter. One of the three men returned a few minutes later and asked a different employee for change. Once he received the change he also went to the pay phone. Thereafter, he met an employee of United Armored who was carrying a bag of cash and papers into the exchange at the doorway and fired a bullet from point-blank range into the man's forehead. The man took the bag and left in a blue compact car. The United Armored driver died minutes later. *Clay*, 349 Ill. App. 3d at 26, 811 N.E.2d at 278.

At the defendant's trial, the State was allowed to introduce evidence of another robbery at a currency exchange five months prior. In that robbery, an armored truck from United Armored delivered cash to the currency exchange in the morning. The owner of the exchange was present for the delivery. Shortly thereafter, an employee of the exchange arrived for work. There were several customers waiting for service. As the employee was preparing to enter the employees-only area, one of the men in the waiting area grabbed the employee, pulled a gun, and said, " '[O]pen up, motherfucker, or I'll blow his head off.' " *Clay*, 349 Ill. App. 3d at 28, 811 N.E.2d at 280. He then pushed the employee into the employees' area and began yelling, " '[G]ive it up, motherfucker, give it up.' " The employee loaded a bag with cash and the robber took the money and left. *Clay*, 349 Ill. App. 3d at 28, 811 N.E.2d at 280.

On appeal, the defendant argued that the trial court should not have allowed the testimony regarding the robbery of a different currency exchange under the *modus operandi* exception. *Clay*, 349 Ill. App. 3d at 30, 811 N.E.2d at 282. This court agreed with defendant and found that the trial court abused its discretion in allowing the testimony regarding the prior robbery of the currency exchange. In reaching this conclusion, this court found that the similarities between the two crimes "do not earmark the two robberies as the work of the same individuals." *Clay*, 349 Ill. App. 3d at 33, 811 N.E.2d at 284. This court found the differences in the crimes ("one crime occurred after delivery and the robber announced a stickup of persons working for the exchange, while the other occurred before delivery and the robber shot the deliveryman without saying a word to him" (*Clay*, 349 Ill. App. 3d at 33-34, 811 N.E.2d at 284)) outweighed the similarity ("both crimes occurred around the time of a delivery from United Armored" (*Clay*, 349 Ill. App. 3d at 33, 811 N.E.2d at 284)).

◼ Although we agree with the State that some similarities exist between the three crimes, namely, that defendant was an "insider" and he "covered his tracks," after reviewing the record in the instant case, we find that, like *Clay*, those similarities are insufficient to warrant the circuit court's admission of other crimes evidence. Consider-

ing the facts of this case together with the facts of the Hollywood Park burglary and the Willow Springs burglaries in their entireties, the differences between the three crimes plainly outweigh the similarities.

First, and most importantly, this case involved a murder. Nan Toder was brutally slashed in the head with a machete several times. She was found with panty hose tied around her neck and phone cords tied around her wrist and ankles. Neither the Hollywood Park burglary nor the Willow Springs burglary involved a crime of violence. In fact, there was no testimony with respect to either burglary that there was anyone present other than defendant and his accomplice. Additionally, a weapon was used in this case while there was no indication that defendant carried or used a weapon in the Hollywood Park or Willow Springs burglaries.

Defendant employed different strategies in gaining access to the establishments. In the Hollywood Park burglary, defendant gained access to the office by cutting a hole in the roof and lowering himself down. He then used a key that he fashioned out of plexiglass to open the safe. In the Willow Springs burglaries, there was testimony that tape had been placed over the lock on the building's exit door. The door to one of the offices that was burglarized was damaged. The doors on the other offices that were burglarized assumedly had no damage and the locks still worked. In the instant case, it was opined that defendant accessed Toder's room through the adjoining door by dismantling the deadbolt.

The locations of the crimes differ significantly. Hollywood Park is an amusement center. Old Willow Springs Shopping Center contains offices and retail establishments. The Hampton Inn is a hotel.[1] Additionally, the burglary of Hollywood Park occurred in 1992, while Toder's murder occurred in 1996 and the Willow Springs burglaries occurred in 1998.

There are also distinct differences in the items removed from each crime scene. In the Hollywood Park burglary, defendant removed three bags of cash totaling approximately $25,000. In the Willow Springs burglaries defendant took computer equipment, a fax machine and office supplies. In the case *sub judice*, although defendant was charged with felony murder based on residential burglary and burglary in addition to murder, there was no evidence presented that anything was taken from Toder's room.

Our discussion of the differences between the murder in this case and the Hollywood Park and Willow Springs burglaries could continue

---

[1] Hollywood Park and the Hampton Inn are both located in Crestwood, Illinois.

*ad infinitum.* The salient differences significantly outweigh the similarities. Therefore, we have no difficulty finding that the trial court abused its discretion by permitting testimony concerning defendant's prior burglaries.

Even assuming *arguendo* that the other crimes evidence was relevant and admissible to demonstrate *modus operandi* in the case at bar, because the identity of defendant was at issue, we find that the probative value of such evidence is outweighed by its prejudicial effect. See *People v. Bedoya*, 325 Ill. App. 3d 926, 940, 758 N.E.2d 366, 379 (2001).

Other crimes evidence, although relevant, must not become a focal point of the trial. *People v. Thigpen*, 306 Ill. App. 3d 29, 37, 713 N.E.2d 633, 639 (1999). The trial court should prevent a "mini-trial" of a collateral offense. *People v. Nunley*, 271 Ill. App. 3d 427, 432, 648 N.E.2d 1015, 1018 (1995). This can be accomplished by the careful limitation of the details of the other crimes to what is necessary to "illuminate the issue for which the other crime was introduced." *Nunley*, 271 Ill. App. 3d at 432, 648 N.E.2d at 1018.

In the instant case, the trial court allowed the State to present two trials within a trial; one on the Hollywood Park burglary, the other on the Willow Springs burglaries. Both Thomas Brennan and Chris Paglia testified at great length and with extraordinary specificity with respect to the Hollywood Park burglary. The record shows the testimony of these two witnesses accounts for 101 pages of the total record. In addition, these two witnesses viewed five photographs on direct examination. The jury also heard from six witnesses with respect to the Willow Springs burglaries. While these witnesses admittedly testified in less detail than Brennan and Paglia, they viewed and testified to a total of 22 photographs depicting the graffiti and the stolen equipment.

As if the presentation of numerous other crimes witnesses was not excessive enough, the State compounded the error by making repeated references to the Hollywood Park and Willow Springs burglaries during closing argument. At closing argument, the State outlined the alleged similarities between Toder's murder and the Hollywood Park and Willow Springs burglaries. It essentially attempted to persuade the jury that the murder and the burglaries shared such indistinguishable characteristics, that if defendant committed one, he necessarily committed the other.

The presentation of other crimes evidence in this case was highly detailed and flagrantly excessive. We have no doubt that this testimony and argument served to inflame the jury and to "lure the factfinder into declaring guilt on a ground different from proof specific to the of-

fense charged." *Old Chief v. United States*, 519 U.S. 172, 180, 136 L. Ed. 2d 574, 588, 117 S. Ct. 644, 650 (1997). Based on the cumulative evidence of other crimes in this case, we cannot say that the jury did not convict defendant because it felt defendant was a bad person deserving punishment. *Lindgren*, 79 Ill. 2d at 137, 402 N.E.2d at 242. Although the trial court did give the jury limiting instructions regarding the other crimes evidence at the conclusion of the evidence, the probative value of this evidence was significantly outweighed by its prejudicial effect.

The State also suggests that if we find the other crimes evidence to be inadmissible under the *modus operandi* exception, we must consider whether the other crimes evidence is alternatively independently admissible under the identity exception. The State urges us to commence this analysis because defendant "had several distinguishing characteristics that bore on the question of the identity of the person who entered Nan Toder's room."

*Modus operandi* and identity "are two distinct exceptions to the exclusionary rule on evidence of other crimes." *People v. Tipton*, 207 Ill. App. 3d 688, 695, 566 N.E.2d 352, 359 (1990). In *Tipton*, defendant was prosecuted for aggravated sexual assault and armed robbery. Evidence presented at trial showed that on September 27, 1986, at approximately 11 p.m., defendant approached the victim from behind as she was walking westbound on Cornelia near the Ravenswood "el" stop. The defendant raised his hand displaying a meat cleaver. Defendant said, " '[d]on't say anything or I'll cut your head off.' " *Tipton*, 207 Ill. App. 3d at 691. Holding the meat cleaver to the victim's neck, defendant walked the victim to a nearby empty lot where defendant demanded the money from the victim's purse. The victim gave the defendant $5 that she had in her pocket. The defendant then ordered the victim to stand up, and again holding the meat cleaver to her neck, walked her down an alley between two garages. Once at the garages, defendant removed all of the victim's clothing and ordered her to perform various sexual acts. The victim gave a description of the offender to the police and later identified the defendant in a police lineup. *Tipton*, 207 Ill. App. 3d at 691-92, 566 N.E.2d at 356.

At trial, the State introduced evidence of the prior armed robbery of Anne Penman to establish *modus operandi* and identity. Penman testified that she was in the vestibule of her apartment at 737 West Cornelia on September 27, 1986, between 11:30 and 11:45 p.m., when she heard a voice behind her say, " 'give me your purse or I'll cut your head off.' " *Tipton*, 207 Ill. App. 3d at 692. Penman turned and saw a man whom she later identified as defendant and tossed him her purse. She saw that defendant was carrying a meat cleaver in his hand. *Tipton*, 207 Ill. App. 3d at 692-93, 566 N.E.2d at 357.

This court found that the trial court properly admitted the testimony of Penman as other crimes evidence to establish *modus operandi* and identity. *Tipton*, 207 Ill. App. 3d at 696, 566 N.E.2d at 358.

> "Here the evidence at trial showed that complainant and Penman were both approached on the same evening, in the same vicinity, by a black male haling a meat cleaver. The assailant threatened both women, stating that he would cut off their heads. We do not believe it to be common to most rapes and robberies that the perpetrator carries a meat cleaver and threatens decapitation." *Tipton*, 207 Ill. App. 3d at 695, 566 N.E.2d at 358.

Although the State is correct that identity can form a separate exception for allowing the admission of evidence of other crimes, we find the State's identity argument is subsumed in its identity-through-*modus-operandi* argument. Similar to *Tipton*, it is not possible in this case to sever that evidence which is admissible to prove identity through *modus operandi* from that evidence that is admissible solely to prove identity. Consequently, the State's argument that evidence of the Hollywood Park burglary and the Willow Springs burglaries are admissible independently to prove identity lacks merit.[2]

Finally, the State contends that should we find the admission of other crimes evidence in this case was erroneous, any error was purely harmless.

In *People v. Wilkerson*, 87 Ill. 2d 151, 157, 429 N.E.2d 526 (1981), our supreme court set out three ways for measuring harmless error: (1) focusing on the error to determine whether it might have contributed to the conviction; (2) examining the other evidence in the case to see if overwhelming evidence supports the conviction; and (3) determining whether the evidence is cumulative or merely duplicates properly admitted evidence. See *People v. West*, 355 Ill. App. 3d 28 (2005).

As previously discussed, we believe that the admission of the other crimes evidence in this case undoubtedly contributed to defendant's conviction. There was no physical evidence linking defendant to Toder's murder; no DNA, no hair, no fingerprints, no eyewitnesses and no confession. "[E]rroneously admitted other crimes evidence carries a high risk of prejudice and ordinarily calls for reversal." *People v. Howard*, 303 Ill. App. 3d 726, 732 (1999). In purely circumstantial cases such as this one, other crimes evidence, if improperly admitted,

---

[2]The State cites several federal cases in support of this argument. However, federal cases are not binding on this court. *People v. Doyle*, 61 Ill. App. 3d 571, 577 (1978).

can never be harmless error. The effect of this evidence deprived defendant of the right to a fair trial, and the error was not harmless.

Given that we have determined that the trial court committed reversible error by admitting evidence of defendant's prior burglaries, we need not address defendant's remaining claims. However, we will address defendant's argument that the trial court erred in allowing evidence that defendant asked a former girlfriend to pose nude because it is likely to reoccur on retrial.

■ Prior to trial, defendant brought a motion *in limine* to bar the State from presenting "any evidence regarding prior personal relationships between defendant and former female acquaintances, any posing or modeling of or by those acquaintance." The trial court denied defendant's motion. Defendant now argues that the trial court erred in denying his motion *in limine*.

At trial, defendant's former girlfriend, Patricia Yodka, testified that while she was dating defendant, he would have her pose nude. Defendant would instruct her to lie on her back with her arms back, her knees bent, her legs sprawled open and her head either up or back. At trial, the State argued in closing argument that defendant "posed" Toder just as he "posed" Yodka. The State argues that this evidence was properly admitted because of its probative value.

Evidence is relevant generally if it has any tendency to make the existence of a fact of consequence more probable or less probable than it would be without the evidence. *Peeples*, 155 Ill. 2d at 455-56, 616 N.E.2d at 309. The decision to admit or exclude evidence is left to the sound discretion of the trial court judge. *People v. Tolliver*, 347 Ill. App. 3d 203 (2004). A reviewing court will not reverse the decision of a trial court with respect to the admission of evidence unless there has been an abuse of that discretion. *Tolliver*, 347 Ill. App. 3d 203.

Nan Toder's body was found "posed," lying on the floor between two beds in Room 227. Dexter Bartlett testified that Toder lay on her back, propped up on her elbows with her head tilted back. She was wearing a robe, which was open, exposing her breasts and pubic area. This description is strikingly similar to that given by Yodka. We cannot therefore find that the testimony of Yodka was irrelevant. The denial of defendant's motion *in limine* was not an abuse of discretion.

For the reasons stated, the judgment of the circuit court is reversed and the cause remanded for a new trial. Because we are remanding this case for a new trial, we must consider whether the evidence was sufficient to sustain a conviction beyond a reasonable doubt. After a careful review of the record in this case, we find that the evidence was sufficient to prove defendant guilty beyond a reasonable doubt. Therefore, we find that there is no double jeopardy impediment to a

new trial. *People v. Taylor*, 76 Ill. 2d 289, 309 (1979). However, we note that we have made no finding as to defendant's guilt that would be binding on retrial. *People v. Fornear*, 176 Ill. 2d 523 (1997).

Reversed and remanded.

HOFFMAN and SOUTH, JJ., concur.